THE STATE OF OHIO, APPELLANT AND CROSS-APPELLEE, *v.*
WILSON, APPELLEE AND CROSS-APPELLANT.

[Cite as State *v.* Wilson (1987), 30 Ohio St. 3d 99.]

(No. 86-383—Decided May 13, 1987.)

---

[1] This explanation for the sole presence of barium was not disclosed in the laboratory report. The report merely stated that the absence of antimony could be explained by the fact that residues may not have been expelled when the firearm was discharged or that any residues deposited on the hands of the defendant were removed therefrom prior to any attempted acquisition of samples. (Defendant's Proffered Exhibit A.)

*Anthony G. Pizza,* prosecuting attorney, and *Dean P. Mandross,* for appellant and cross-appellee.

*Julia K. Casey,* for appellee and cross-appellant.

*Per Curiam.* The instant appeal concerns the continuing duty of a party in a criminal proceeding to disclose discoverable matter which would have been subject to a request for discovery had such matter been available at the time that the request was made. Counsel for defendant-appellee and cross-appellant urges that where the failure to disclose such information misleads the opposing party to believe that information previously disclosed and relating thereto is exculpatory in nature, the admission of the withheld information at trial is reversible error. We agree.

Crim. R. 16(D) provides:

"If, subsequent to compliance with a request or order pursuant to this rule, and prior to or during trial, a party discovers additional matter which would have been subject to discovery or inspection under the original request or order, he shall promptly make such matter available for discovery or inspection, or notify the other party or his attorney or the court of the existence of the additional matter, in order to allow the court to modify its previous order, or to allow the other party to make an appropriate request for additional discovery or inspection."

It is undisputed that the prosecution was aware of the substance of the Havekost testimony approximately one month prior to trial. In October 1984, the prosecution discussed the test results with Havekost and was apprised that the presence of barium on the hands of defendant was consistent with his having discharged a firearm equipped with ammunition possessing this element alone. This explanation of the test results was reiterated in a similar conversation on the day of the trial. However, this information was never provided to defense counsel. Consequently, the testimony of Havekost, far from being exculpatory in nature, was, as best, irrelevant and, at worst, devastating to the defense of Crawford Wilson.[2]

---

[2] A conclusive determination resulting from the neutron activation analysis test requires,

The unexpected nature of the expert testimony placed the defense in an awkward position. In an attempt to demonstrate that the expert had failed to disclose in his report the possibility that ammunition containing only barium could have been employed, the cross-examination tended to underscore the false conclusion that the presence of this element on the hands of defendant was probative of his guilt. Undoubtedly, the efforts of defense counsel were calculated to demonstrate that he was not apprised of the nature of the Havekost testimony in advance. In so doing, counsel sought to lay the foundation for a motion pursuant to Crim. R. 16(E)(3) which provides:

"If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances."

Consistent with the provisions of the rule, defense counsel moved the trial court to declare a mistrial or, in the alternative, to strike the testimony. Counsel also moved to admit the laboratory report so as to ameliorate the damaging testimony of Havekost. All these motions were denied.

In support of the trial court's determination, the state maintains that the proper response to this surprise testimony would have been a defense request for a continuance. It is highly questionable whether a request for a continuance would remedy the situation. The damaging testimony had already been given and its unexpected nature precluded the opportunity for the defense to object to its admission or for the trial judge to rule on its admissibility prior to its presentation before the jury. Given these circumstances, it is equally unlikely that a motion to strike the testimony would have been effective.

While conceding that it failed to comply with Crim. R. 16(D), the state maintains that such non-compliance was "harmless beyond a reasonable doubt." This contention is highly speculative at best. It is certainly reasonable to conclude that the trial strategy employed by the defense and its pre-trial preparations would have been materially altered by prior knowledge of the Havekost testimony. Implicit in the argument advanced by the state is that there was ample evidence in the record apart from the Havekost testimony. The confidence expressed by the state in its case on appeal

---

within certain parameters, the presence of *both* barium and antimony. The presence of only one element renders the results inconclusive since the element could have originated from another source. Thus, if apprised of the testimony of Havekost prior to trial, the defense would have had the opportunity to object to its relevance or to suggest to the court that any probative value of testimony relating to only one element would be outweighed by its prejudicial impact. The defense would also have been able to seek expert testimony which might have contradicted the expert testimony presented by the state.

is in marked contrast to its persistent references to the Havekost testimony during trial. In particular, the state appeared to relish the opportunity to exploit the false conclusion that the presence of only barium on the hands of the defendant was probative of the fact that he had fired the gun.

Rather than confirming the position maintained by the state that the expert testimony was ancillary to its case-in-chief, the record discloses a pattern of prosecutorial behavior calculated to entrap the defense through a mistaken but understandable reliance on the facially exculpatory nature of the laboratory report. The prosecution unquestionably sought to foster a misconception with respect to the forensic report and was aware that its efforts were successful. The following exchange during opening statement is particularly illustrative:

"MR. BRITZ: * * * [for defendant] There's a test that has been devised to determine whether people have fired guns * * *. The evidence in this case will be that these tests proved negative.

"MR. MANDROSS: * * * [for the state] I'm going to—excuse me, strike that.

"MR. BRITZ: No traces were found on his hand."

It is evident, therefore, that the prosecution was fully aware at the outset of the trial that the construction accorded the report by the defense was erroneous. Far from seeking to correct this misconception, the prosecution sought to exploit it. Thus, during closing argument the prosecution remarked:

"MR. CONKLIN: * * * Defendant promised us all kinds of things. The defendant promised us that the tests were negative.* * *'"

This course of conduct hardly evidences the confidence in its case-in-chief that the state has expressed on appeal. Rather, the constant references to the disputed testimony reveal a conscious effort on the part of the prosecution to conduct the type of "trial by ambush" condemned by the court in *United States* v. *Kelly* (C.A. 2, 1969), 420 F. 2d 26, 29, when it considered a former federal counterpart to Ohio Crim. R. 16(D).

This court is cognizant of the position in which the trial judge was placed. The failure to be apprised of the Criminal Rule violation prior to the testimony of Havekost prevented the court from ruling on motions before the damage was done. Nevertheless, it is our conclusion that the failure of the trial court to strike the testimony or otherwise exclude it from evidence was an abuse of discretion. This error was further compounded by the denial of the defense motion to admit the laboratory report. We therefore hold that the failure of the state to comply with Crim. R. 16(D) constituted a denial of procedural due process.

Accordingly, the trial court committed reversible error in denying the motions advanced by the defense. The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

SWEENEY, DOUGLAS, WRIGHT and H. BROWN, JJ., concur.

MOYER, C.J., HOLMES and LOCHER, JJ., dissent.

HOLMES, J., dissenting. I do not agree with the decision to grant a new trial in this case. I cannot accept the view that either the trial court or the prosecutor erred to the prejudice of defendant in the case below. Also, it seems most unreasonable to reverse all three of the attempted murder convictions. Accordingly, and for the reasons set forth below, I must respectfully dissent.

In the case before us, the prosecutor had complied with all of his responsibilities under Crim. R. 16. He had made available to defendant the report from the FBI laboratories. Also, the testifying expert was made fully available to defense counsel in advance of trial. Defense counsel asserts he had intended to rely upon the report which concluded that no "significant amounts" of antimony and barium were found on the defendant. This, of course, he was free to do. That it was an obvious mistake in judgment, as pointed out by the trial court below, becomes clear upon a perusal of the report, and the literature easily available to defense counsel.

The report is quite brief and conclusory. It states that the "elements antimony and barium * * * are components of most primer mixtures * * *" and that the test utilized was the neutron activation analysis ("NAA"). The NAA test is a well-known method of detecting primer residue on the hands of suspects and has been in use for over ten years. See, e.g., Stone, Evidence of Firearms Discharge Residues (1981), 33 Baylor L. Rev. 285, 286; Moenssens, Inbau & Starrs, Scientific Evidence in Criminal Cases (3 Ed. 1986) 528; Imwinkelried, Scientific and Expert Evidence (2 Ed. 1981) 279-339; Yefsky, Law Enforcement Science and Technology (1967) 372-375; McFarland & McLain, Rapid Neutron Activation Analysis for Gunshot Residue Determination (1973), 18 J. For. Sci. 226; Matricardi & Kilty, Detection of Gunshot Residue Particles from the Hands of a Shooter (1977), 22 J. For. Sci. 725, 726; Basu, Formation of Gunshot Residues (1982), 27 J. For. Sci. 72; Tillman, Automated Gunshot Residue Particle Search and Characterization (Jan. 1987), 32 J. For. Sci. 62.

To those who have made even slight inquiries into the NAA technique, the phrase "most primer mixtures," as utilized in the report, coupled with the fact that a .22 caliber pistol was the weapon fired, would immediately cause concern as to the reliability of the report. This is because it is common knowledge among evidence specialists, as shown at trial, that the primers of most .22 caliber, rim-fire ammunition contain no antimony. The abundant literature in this field also makes reference to this fact. See, e.g., Fisher, Svensson & Wendel, Techniques of Crime Scene Investigation (4 Ed. 1987) ("The elements of barium and antimony are characteristic of most ammunition with the exception of [most] .22 caliber ammunition * * *." [Id. at 265.]); Andrasko & Maehly, Detection of Gunshot Residues

on Hands by Scanning Electron Microscopy (1977), 22 J. For. Sci. 279 ("Primers of rim-fire shells * * * often lack antimony * * *." [Id. at 285.]); Newton, Rapid Determination of Antimony, Barium and Lead in Gunshot Residue via Automated Atomic Absorption Spectrophotometry (1981), 26 J. For. Sci. 302, 308-309.

There is no doubt that the prosecution was aroused by the inherent conflict in the report and did in fact make additional inquiries of the expert prior to trial. This expert was fully available for defense counsel's inquiries prior to and during the early stages of the trial. It is most difficult to credit defense counsel's assertions that he intended to rely upon the report, since the prosecution made it clear prior to trial that the state intended to call upon the expert for testimony in the state's case-in-chief. Certainly, this fact should have alerted defense counsel that the prosecution intended to circumvent the conclusions contained in the report, and that he (defense counsel) also should make further inquiries. Presumably, counsel did not interview any specialist, local or otherwise, did not seek out the literature in this area, and made no inquiries even as to the name and phone number of the state's expert.

Defense counsel received an inadvertent yet direct indication that the FBI report was of questionable value on the very first day of trial, October 22, 1984. The state's fourth witness was a member of the scientific investigation division of the Toledo detective bureau. He testified extensively concerning the collection of evidence at the crime scene and from defendant's hands. As he described the NAA test, he stated expressly that primers of center-fire bullets contain both antimony and barium. The FBI expert did not testify until October 24, two days later. Thus, defense counsel had two additional days in which to make remedial inquiry. He also could have requested a continuance, but felt no need to do so.

Consequently, defense counsel cannot claim surprise at the expert's testimony or complain that it differed from the report when the reason for the difference was common knowledge among local as well as federal experts, and was generally available to him from the literature on the subject. Surely one who intends to rely upon a report, particularly a short conclusory report, should be expected to make a reasonable inquiry, if for no other reason than to more effectively substantiate the favorable conclusions. Further, it would be wholly unreasonable to impose upon the prosecution a duty to disclose in advance, as the majority opinion seems to require, not only the full substance of his witness' testimony but also any advantage he may possess by virtue of knowledge in the expert's field of study. This goes well beyond the requirements of Crim. R. 16(D).

Moreover, the testimony and report at issue played an insignificant part in the three attempted murder convictions, either as to the state's case or that of the defense. While the state brought out that defendant had three to four times the normal amount of barium on the backs of his hands, defense counsel forced the expert to admit that his test results were incon-

clusive and that multiple firings would have left more residue than a single shot. Also, this testimony took but a small portion of the two volumes of trial transcript, and only one to two hours of the nearly three days the state required to complete its case.

This court has asserted its doctrine of harmless error in paragraph six of the syllabus in *State* v. *Williams* (1983), 6 Ohio St. 3d 281, 6 OBR 345, 452 N.E. 2d 1323, which states:

"Where * * * error in the admission of evidence is extant, such error is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt." See, also, *United States* v. *Hasting* (1983), 461 U.S. 499, 508-509; *Harrington* v. *California* (1968), 395 U.S. 250, 254.

By any standard but the most insensitive, the evidence remaining in the case *sub judice,* after removing the conflicting forensic testimony, is overwhelmingly sufficient to uphold all three convictions. The state established by direct testimony that defendant was the driver of the automobile which transported John Wilson and the loaded weapons to the crime scene. He was also observed sitting in the vehicle with his brothers prior to the shootings and was heard to shout various threats, including killing and other retaliation, against the ultimate victims.

Several witnesses placed defendant in back of the establishment, at the rear, southeast corner of the parking lot, near or next to the smashed Subaru which belonged to two of the victims. One witness observed him just before the spray of bullets was fired at Officer Harris and testified that he (defendant) had a long, shiny object in his hand of the same length as the .22 caliber revolver ultimately recovered from that location. It is undisputed that just after Officer Harris shot defendant's brother in the neck, a series of shots was fired at the officer from the back of the parking lot. The bullets struck the automobile behind which Officer Harris ran for protection. Defendant was then observed by yet an additional witness to be crouching in front of the Subaru, at the very place where the pistol was discovered minutes later.

Most condemning of all was the testimony of Officer Poiry as to defendant's confessions which were not the subject of dispute upon appeal. Defendant admitted to transporting his brothers and the weapons to the crime scene. He also confessed to being in possession of the .22 caliber revolver just prior to the shootings. He then asserted that his brother John took back the .22, adding it to the .38 he already possessed. After John was shot, defendant stated he removed the .22, but not the .38, from John's hand and hid it in front of the Subaru. Since the .22 was the weapon which was fired at Officer Harris, and because the firing originated about fifty yards away from John's body, the inculpatory nature of the admission, as well as its contradictory features, weighed heavily against defendant. In a subsequent confession, for the asserted purpose of exculpating himself, defendant stated that he in fact got the .22

from his brother Robert. However, he then admitted that he entered the parking lot from the rear and placed the weapon in front of the Subaru. The above evidence is so overwhelming that any potential error concerning the expert's report is surely harmless.

In addition, the evidence of defendant's confession, plus the eyewitness testimony to the effect that defendant transported those who perpetrated the initial shootings, as well as the weapons so utilized, created an irrefutable presumption that defendant committed the crimes of aiding and abetting the attempts to murder the first two victims. The same is true regarding the attempted murder of Officer Harris by John Wilson. The disputed expert testimony, which forms the basis of the majority's determination, is applicable only to the issue of whether defendant himself actually shot at Officer Harris. It seems rather insensitive in the extreme, therefore, to reverse all three attempted murder convictions.

Consequently, I dissent.

MOYER, C.J., and LOCHER, J., concur in the foregoing dissenting opinion.