**The STATE of Ohio, Appellee,**

v.

**KARL, Appellant.**

[Cite as *State v. Karl* (2001), 142 Ohio App.3d 800.]

Court of Appeals of Ohio,
Seventh District, Columbiana County.

No. 00CO5.

Decided May 24, 2001.

802

*Robert Herron,* Columbiana County Prosecuting Attorney, and *Tammy Riley Jones,* Assistant Prosecuting Attorney, for appellee.

*William Taylor,* for appellant.

---

VUKOVICH, Presiding Judge.

Defendant-appellant Andrew M. Karl appeals from his convictions of uttering a forged writing and aggravated theft that were entered after a jury trial in the Columbiana County Common Pleas Court. For the following reasons, the judgment of the trial court is reversed, and this cause is remanded for a new trial.

## STATEMENT OF FACTS

Appellant was married to Tonya Karl. On July 10, 1997, Ms. Karl brought a typewritten form to be notarized to an insurance agency in East Palestine. This form gave her power of attorney over her aunt Elvira DeCianno's affairs. Ms. Karl informed the notary that her aunt had problems walking and asked if she could take the form out to the car to have her aunt sign. The notary watched Ms. Karl take the form to the car in which a woman was sitting. After Ms. Karl brought the form back inside, the notary and a witness signed the paper.

On December 9, 1997, appellant opened a business account at Citizen's Banking Company in East Palestine in his name doing business as East Palestine Wellness Center. Ms. Karl presented the power of attorney to the account manager. Appellant then presented a handwritten form signed by Ms. DeCianno that stated that he was authorized to act on her behalf with regard to investing and a certain piece of realty. Appellant and Ms. Karl then presented a check payable to Ms. DeCianno for $96,526.90 from the Bell Atlantic Corporation. The proceeds of this check were directed as follows: $85,000 was deposited in appellant's Wellness Center account; $10,500 was deposited in Ms. Karl's checking account; and $1,026.90 was paid in cash.

On December 15, 1997, a check payable to Ms. DeCianno for $13,082.37 from Lucent Technologies was presented to the bank. From this check, $10,000 was deposited into appellant's Wellness Center account and $3,082.37 was paid in cash. On January 20, 1998, another check payable to Ms. DeCianno from Bell Atlantic was presented to the bank. This $37,994.90 check was split so that

$37,000 went into the Wellness Center account and $994 was paid in cash. That January, Ms. DeCianno was admitted to the hospital. Upon being released, she moved into the Karl residence until early March. On January 20, 1998, three $2.14 checks payable to Ms. DeCianno were deposited into the Wellness Center account.

On January 21, 1998, the handwritten form giving appellant authority over Ms. DeCianno's investments was presented to a notary at Century National Bank and Trust who placed a signature-guaranteed stamp below the signature of Ms. DeCianno. The form had additions, since it was presented to Citizen's Banking Company; in that it was now titled "Limited Power of Attorney," it had a sentence that specifically authorized appellant to buy and sell stocks and bonds and it had been signed again by Ms. DeCianno.

Thereafter, appellant presented this handwritten signature guaranteed limited power of attorney to a stockbroker and asked that certain shares of stock owned by Ms. DeCianno be sold. The stockbroker refused to rely on the limited power of attorney. Thus, on January 29, 1998, appellant brought Ms. Karl with him and presented Ms. Karl's typed and notarized power of attorney to the stockbroker. The stock was sold, and on February 19, 1998, the Karls received a check payable to Ms. DeCianno for $29,260.06. The proceeds of this check were divided so that $19,260.06 was deposited into appellant's Wellness Center account and $10,000 was deposited in Ms. Karl's checking account.

In early March 1998, Ms. DeCianno left the Karl residence with her brother and visited a lawyer. This lawyer had a copy of Ms. Karl's typed power of attorney, as he previously relied on the power of attorney to transfer realty to Ms. Karl. Upon counseling Ms. DeCianno, the lawyer sent a letter to Ms. Karl signed by Ms. DeCianno, stating in part, "I write to cancel the Power of Attorney which I signed on your behalf in East Palestine on July 10, 1997." The letter also requested the return of a $37,499 check from a sale of stock. Thereafter, Ms. DeCianno contacted the police. The Karls presented the police with Ms. Karl's typed power of attorney and appellant's handwritten signature-guaranteed limited power of attorney.

On December 15, 1998, appellant and Ms. Karl were indicted on four counts. Count I charged the Karls with forgery in violation of R.C. 2913.31(A)(3), a fifth degree felony, and alleged that the typed power of attorney was a forgery. Counts II and III charged the Karls with uttering a forged writing in violation of R.C. 2913.31(A)(3), fourth degree felonies due to the amounts lost by the victim. Specifically, Count II alleged that the forged power of attorney was uttered to the bank on December 9, 1997, along with the $96,526.90 check, and Count III alleged that the forged power of attorney was uttered to the stockbroker on January 29, 1998, in order to sell stocks worth $29,260.06. Count IV charged the

Karls with aggravated theft in violation R.C. 2913.02(A), a third degree felony. The theft became aggravated by adding the amount of each check payable to Ms. DeCianno that was cashed by the Karls for a total of $176,869.84.

Appellant's trial was bifurcated from that of his wife. The trial was scheduled for Monday, November 8, 1999. On Thursday, November 4, the state informed defense counsel that it discovered that the handwritten power of attorney that appellant gave to the bank was different from the one that he gave to the stockbroker and the police. The next day, defense counsel spoke to the notary who guaranteed the signature on the handwritten power of attorney. Being a Pennsylvania resident, she refused to attend the trial in the absence of a subpoena from a Pennsylvania court. Defense counsel filed a motion *in limine* asking that the state be precluded from submitting the version of the handwritten limited power of attorney that appellant had presented to the bank. Counsel argued that the evidence was revealed too late for him to obtain the necessary witnesses. In the alternative, defense counsel requested a continuance. The court denied both motions.

Immediately before trial, the state dismissed Count I. A jury trial proceeded on the remaining three counts on November 8 and 9, 1999. At trial, Ms. DeCianno testified that she does not remember if she signed Ms. Karl's typed power of attorney. She then stated that she never gave Ms. Karl power of attorney over her affairs. She claimed not to remember going to the lawyer who wrote the letter that she signed that explicitly revoked the power of attorney. As for appellant's handwritten limited power of attorney, Ms. DeCianno either testified that she signed a blank piece of paper or a document to which information had been added. First, she admitted that she offered them her interest in certain realty. She then stated that she did not sign a paper giving them any interest, and, later, she contradicted that statement.

Ms. DeCianno implied that she stayed with the Karls against her will and said that she was fed only rice. Although she answered phones for the Karls at the Wellness Center, she stated that outgoing calls were blocked from the center and the home so that she could not call for assistance. She testified that she did not give the Karls consent to cash any of the seven checks.

The notary and the witness from the insurance agency both testified that they saw Ms. Karl approach a woman in the passenger seat of her car with the power of attorney. Neither could identify the woman. The account manager who opened appellant's Wellness Center account and the stockbroker both testified that they relied on Ms. Karl's power of attorney rather than appellant's handwritten paragraph.

Ms. DeCianno's brother testified that he brought her to the lawyer. The lawyer testified that because he had a copy of Ms. Karl's power of attorney, he

used language in the letter presuming that Ms. DeCianno had granted the power of attorney, as he was unaware that there were allegations of forgery.

The state's forensic documents examiner then testified that the signature on Ms. Karl's power of attorney did not appear to be the natural signature of Ms. DeCianno. He admitted that he could not rule out that it was in fact her signature. The examiner also conclusively determined that the first signature on appellant's handwritten limited power of attorney was in fact that of Ms. DeCianno and testified that the second signature appeared to be hers as well. This testimony was consistent with the report submitted to the defense in discovery. However, on redirect, the state elicited testimony from this witness that suggested that Ms. Karl forged Ms. DeCianno's signature on her power of attorney, pointing out that the letter "o" had a terminal stroke that is consistent with Ms. Karl's writing exemplar.

After hearing the testimony, the jury found appellant guilty on all three counts. Appellant was sentenced to eighteen months on Counts II and III and the maximum sentence of five years on Count IV, all to run concurrently. The within timely appeal followed after the trial court's denial of a motion for a new trial.

## ASSIGNMENT OF ERROR NUMBER ONE

Appellant sets forth six assignments of error, the first of which provides:

"Prosecutorial misconduct in failing to disclose damaging portions of its expert report and opinion, in failing to disclose an altered power of attorney in a timely manner, failing to provide the correct address of a witness in a timely manner, and misleading the jury during closing arguments warrant reversal of the case *sub judice.*"

Appellant's first contention is that the state deprived him of a fair trial by failing to disclose the result of the analysis of the handwriting expert who testified that the "o" in the signature on the power of attorney was consistent with the handwriting of Ms. Karl. In response to a discovery request, the state disclosed the report of this expert. Regarding the power of attorney, the report merely stated that the signature did not appear to be the natural signature of Ms. DeCianno. The expert report opined that other items, such as some checks bearing the signature of Ms. DeCianno, were actually signed by Ms. Karl but did not contain an opinion that there were consistencies between the signature on the power of attorney and the handwriting of Ms. Karl. Appellant preserved this argument for appeal in his objection to the expert's testimony about the consistency.

The state's only response to appellant's complaint is that defense counsel opened the door to the line of questioning on redirect. As such, the state

implicitly concedes that the opinion regarding the consistency should have been disclosed in discovery. Moreover, Crim.R. 16(B)(1)(d) requires the state to disclose the results or reports of scientific tests made in connection with the case that are known or by due diligence may become known to the prosecutor. In reading the questioning on redirect, it is apparent that the prosecutor knew that the expert had found a consistency in the terminal strokes of Ms. Karl's signature and the signature on the power of attorney. · Hence, the state should not have introduced this surprise opinion, which is the result of a handwriting analysis, without previously disclosing this opinion to the defense. The importance of the disclosure is revealed upon realizing that appellant was relying on the state's own expert to put reasonable doubt in the minds of the jurors as to whether Ms. Karl's power of attorney was forged. Had appellant been aware that the expert actually found consistencies, he may have called his own expert. Furthermore, a handwriting expert must opine with a reasonable degree of scientific certainty, and whether this occurred regarding the consistency characterized by the expert as nonmajor is questionable. See *State v. Loza* (1994), 71 Ohio St.3d 61, 77, 641 N.E.2d 1082, 1101–1102.

■ As for the state's contention that defense counsel opened the door to the line of questioning, we find this argument to be flawed. Counsel's mention of a blunt end stroke in connection with his questioning of the expert on the clues that a writing is a forgery did not open the door to the state's questioning on minor consistencies between two signatures. Furthermore, we do not see how defense counsel can open a door to an expert opinion based on a test when that opinion was never disclosed to him. The question thus becomes whether this error is reversible. We shall reserve our opinion on this issue until after we analyze various other errors of which appellant complains.

■ Under his first assignment of error, appellant also alleges that the state violated the discovery rules by failing to supplement discovery with the address of a witness who was on the state's witness list. Carol Verrico was the notary who placed the signature-guaranteed stamp on appellant's limited power of attorney. When she notarized the document, she was working for Century National Bank in Pennsylvania. As such, the state used the bank's address as her address for purposes of the witness list. Thereafter, Century National Bank was bought out by another bank for whom Ms. Verrico did not continue to work. Apparently, Ms. Verrico began employment for a different bank in Pennsylvania. The state concedes that it knew of this change prior to the time that defense counsel became aware of the change. The state submits that it was easy to find Ms. Verrico by calling her former employer and asking where she was then employed. The state also notes that defense counsel must have successfully done

this, as he spoke with Ms. Verrico before trial. Regardless, the state violated its continuing duty under Crim.R. 16(D) to supplement discovery.

■ The importance of this witness becomes apparent upon reviewing appellant's next argument regarding his motion *in limine* and request for a continuance. Concerning this issue, appellant complains about the state's late disclosure of a copy of the handwritten paragraph that appellant presented to the bank in December 1997. The bank employee who received this document from appellant was on the state's witness list since February 1999. However, the state did not reveal the document to appellant until Thursday, November 4, 1999, less than two business days prior to trial.

The newly disclosed document did not contain the sentence specifically giving appellant power to buy and sell stocks and bonds, which was in the version of the document previously disclosed in discovery. This sentence was apparently added to the document later. The discovery of this document changed one whole theory of the case for the state and required appellant to prepare a new defense strategy.

With the newly disclosed version of the document, the newly adopted strategy of the state was to imply that appellant fraudulently added the sentence pertaining to stocks and bonds after Ms. DeCianno signed the document. Ms. DeCianno seemed to testify that the paper she signed was blank or at least did not contain information regarding her realty or her stocks. Defense counsel proffered that the testimony of Ms. Verrico would have established that Ms. DeCianno signed a document in front of Ms. Verrico that was not blank. Defense counsel also proffered that Ms. Verrico would explain that a gold medallion-type of signature guarantee was utilized due to the sentence in the document referring to power over stocks and bonds. Such testimony would impeach the veracity and/or memory of Ms. DeCianno and diminish the strength of the state's theory that appellant engaged in other bad acts, such as deceptively asking Ms. DeCianno to sign a paper without letting her read it and adding statements to notarized documents without the principal's knowledge.

In *State v. Wilson* (1987), 30 Ohio St.3d 99, 30 OBR 356, 507 N.E.2d 1109, the court noted the prejudice to the defense and the denial of procedural due process that may occur when the state fails to supplement discovery. The court specifically stated that the defense's trial strategy and pretrial preparations may have relied on the unsupplemented aspects of the state's discovery disclosures. *Id.* at 101, 30 OBR at 356, 357–358, 507 N.E.2d at 1110–1111. Similarly, appellant's defense strategy and pretrial preparations were negatively affected by the late disclosure in the case at bar.

The state had the obligation to disclose documents that are material to the preparation of a defense or are intended for use in the prosecution of the offense. Crim.R. 16(B)(1)(c). The state had a continuing obligation to supplement discovery with any such information. Crim.R. 16(D). Although the state supplemented discovery, the timing of the supplementation was so close to the trial date that defense counsel was left with few options with regard to formulating a defense to the new accusations of the state regarding the limited power of attorney. It is noteworthy that the document was in the possession of a state's witness and was available for the state's inspection the entire time. Moreover, the state received notice of the existence of the document two days before disclosing it to appellant but somehow failed to realize the differences between it and the signature-guaranteed document.

Defense counsel timely filed a motion *in limine* and for a continuance the day after the state faxed the newly discovered document. The court heard the issue the next business day, which happened to be the day of the scheduled trial. The court refused to grant the motion *in limine,* the continuance, and the subsequent objection, and allowed the state to admit the document into evidence. Denying the motion *in limine* and objection would have been entirely within the court's discretion if a continuance had been granted. See Crim.R. 16(E) (limiting the court's discretion in similar situations to acts which are just).

■■ For appellant, it was too late to successfully subpoena Ms. Verrico, who refused to attend the trial without a subpoena being issued by the state of Pennsylvania. Upon counsel's urging, at the end of the first day of trial, the court issued an order to the Pennsylvania courts to issue a subpoena; however, the court had already denied a continuance, and trial was resuming the next morning and finishing that afternoon. Thus, there was no time to secure a Pennsylvania subpoena. The prejudice to appellant seems apparent. Upon making these observations of error, we shall reserve our opinion on whether the errors are reversible until appellant's fourth assignment of error which addresses the cumulative effect of all errors.[1]

---

1. Within appellant's first assignment, he also complains that the state created prejudice by misleading the jury in closing arguments. Specifically, the prosecutor reviewed certain withdrawals from the Wellness Center account and noted that a check for more than $31,000 was made payable to appellant two days after he deposited Ms. DeCianno's first check. Any objection to this statement was waived, as appellant failed to object to the trial court. Moreover, the inferences made by the state are permissible. Last, any suggestion that appellant used this money to buy land should have been raised by appellant. The land installment contract submitted to this court by appellant does not establish on its face that the $31,000 check was used for this purpose. Furthermore, the fact that appellant purchased land does not refute any inference that the money was personally used by appellant in the absence of a presentation of evidence on that issue.

## ASSIGNMENT OF ERROR NUMBER TWO

Appellant's second assignment of error argues:

"The lower court erred in allowing the state to admit the audiotape into evidence and/or play it for the jury."

Appellant alleges that the state failed to lay a proper foundation under Evid.R. 901 for the admission of audiotapes generated by a stock transfer service. The unit manager of the stock transfer service testified that all calls are recorded for security purposes and then digitally saved. She researched the recorded calls associated with Ms. DeCianno's account and downloaded these calls from the system to an audiotape. She testified that she sent the tapes to the police department and the prosecutor's investigator. While on the stand, she identified her initials on the label of the tape. The tape was played during the testimony of the prosecutor's investigator. He testified that he received the tape from the unit manager of the stock transfer service. The tape was then admitted over the objection of the defense.

Appellant now complains that there was no evidence presented that the recording equipment was in working order or that the employee whose voice is heard in the tape was competent to operate the recording device. Appellant suggests that some conversations may not have been recorded or certain changes may have been made. Appellant voices suspicion over the fact that the unit manager of the service testified that she sent copies to the East Palestine Police Department and the prosecutor's investigator; however, a police officer testified that he received his copy from the investigator rather than from the unit manager. Appellant also contends that the unit manager of the service who testified was required to listen to the tapes at trial in order to identify them as being the tapes she downloaded from the digital recording system. We find these arguments to be without merit.

■ Pursuant to Evid.R. 901(A), a condition precedent to admissibility is identification or authentication of evidence sufficient to support a finding that the matter in question is what the proponent claims. See *State v. Richey* (1992), 64 Ohio St.3d 353, 360, 595 N.E.2d 915, 922–923 (quoting the rule and noting that the possibility of contamination goes to weight rather than admissibility). As aforementioned, the unit manager testified that employees have no discretion in recording calls and that all calls are automatically recorded. This witness testified that the method of recordation was digital and that in order to duplicate the recordings for the state, she had downloaded the digital recording to make a tape recording. The witness identified the initials on the tape as her own. The prosecutor's investigator then completed the chain of custody and foundational requirements by stating that he received the tape from the unit manager. He

listened to it when he received it, and he listened to it at trial. From this testimony, the state presented sufficient evidence to support a finding that the tapes are what they are claimed to be. Accordingly, this argument is overruled.

■ Appellant next argues that even if the foundational requirements were met, the tape contained inadmissible hearsay. Although appellant objected to the admission of the tapes on many grounds, hearsay was not one of those grounds. Thus, any hearsay argument is waived for purposes of appeal. *State v. Kinley* (1995), 72 Ohio St.3d 491, 497, 651 N.E.2d 419, 424–425. However, pursuant to Crim.R. 52(B), we can review the issue for plain error and reverse if substantial rights have been affected.

Initially, we note that appellant's hearsay argument on appeal is contained in one general sentence without mentioning any specifics. He does not point out which voices on the tape he considers hearsay. If he considers the entire tape to be hearsay, we point appellant to Evid.R. 801(D)(2)(a), which explains that a statement of a party offered against that party is not hearsay. See, also, Evid.R. 801(D)(2)(e), dealing with statements by co-conspirators. Moreover, the state posits that the contents of the tape were not used to prove the truth of the matters asserted in them but rather to prove knowledge and identity of appellant and his wife. See *Kinley,* 72 Ohio St.3d 491, 498, 651 N.E.2d 419, 425; Evid.R. 801(C).

■ This leaves us with the issue of whether admission of the remaining portions of the tape, such as the words of Ms. DeCianno, constituted plain error in violation of the hearsay rule. In addressing this issue, the state contends that the tape was admissible under the business records exception to the hearsay rule. Pursuant to Evid.R. 803(6), records of regularly conducted business activity may be admitted as an exception to the ban on hearsay if made about acts, events, or conditions at or near the time of the occurrence by a person with knowledge.

Although the tape itself was a business record, the contents were not. With the exception of the employees' statements, the statements generated were not made by one with a business duty to report information. Hence, the words spoken by Ms. DeCianno were not business records even though they were recorded automatically by a business. The Second, Eighth, and Tenth Appellate Districts concur with this analysis.

In *State v. Johnson* (Apr. 26, 1996), Montgomery App. No. 15253, unreported, 1996 WL 200623, the Second District stated that a 911 tape may be admissible to prove that a call was made and may be admissible under the excited utterance exception but is not admissible under the business records exception, as the tape cannot vouch for the accuracy of the statements made by the person calling 911. *Id.* at 4. The Eighth and Tenth Districts both stated that the business records

exception does not extend to information provided by an outside source who was under no business duty to be accurate. *Babb v. Ford Motor Co.* (1987), 41 Ohio App.3d 174, 177, 535 N.E.2d 676, 679–680; *State v. Barron* (June 8, 2000), Franklin App. No. 99AP–59, unreported, at 3, 2000 WL 739427. Analogously, the Supreme Court has recognized that information provided to physicians by patients is similarly not admissible as part of a business record. *Mastran v. Urichich* (1988), 37 Ohio St.3d 44, 48–49, 523 N.E.2d 509, 512–513 (stating that patients' narration of their version of the events that caused their injury is outside the scope of the exception). For these reasons, the conversation on the tape that involved Ms. DeCianno will not escape the ban on hearsay by way of the business records exception.

As for the state's contention that the tape was used to prove identity, the entire conversation was not necessary for voice comparisons. Notwithstanding, this witness testified and thus identification of her voice by use of the tape was unnecessary. Regardless, the introduction of Ms. DeCianno's conversation did not appear to be for identification purposes but rather to bolster her credibility and prove the truth of certain matters asserted. Whether the error in playing these portions of the tape was plain and requires reversal will be addressed *infra* in conjunction with appellant's fourth assignment of error.

## ASSIGNMENT OF ERROR NUMBER FOUR

Appellant's fourth assignment of error provides:

"The above errors, when taken together deprived the defendant, Andrew Karl, of a fair trial as guaranteed under the Ohio and United States Constitutions' Due Process Clauses."

Under this assignment appellant urges that the effect of cumulative error deprived him of a fair trial. Pursuant to the cumulative error doctrine, the existence of multiple errors, which may not individually require reversal, may violate a defendant's right to a fair trial. *State v. Madrigal* (2000), 87 Ohio St.3d 378, 397, 721 N.E.2d 52, 70, citing *State v. DeMarco* (1987), 31 Ohio St.3d 191, 31 OBR 390, 509 N.E.2d 1256 (where the Supreme Court first recognized the doctrine). To affirm in spite of multiple errors, we must determine that the cumulative effect of the errors is harmless beyond a reasonable doubt. *DeMarco,* 31 Ohio St.3d at 195, 31 OBR at 390, 509 N.E.2d at 1260 (stating that the errors can be considered harmless if there is overwhelming evidence of guilt or other indicia that the errors did not contribute to the conviction). This we cannot do.

Here, we are left with the following overwhelming facts: (1) the state's expert could not opine whether the power of attorney upon which all charges revolve is a forgery; (2) the purported victim did not remember if she signed the

power of attorney; and (3) the victim signed a letter recognizing that she granted her niece power of attorney. In light of the errors analyzed above, there is not such overwhelming remaining evidence of appellant's guilt that we are comfortable making the speculative statement that the errors did not contribute to his conviction. Because the conglomeration of errors appear to be prejudicial and outcome-determinative, we cannot state that the cumulative effect of the errors is harmless beyond a reasonable doubt. Therefore, appellant's fourth assignment of error is sustained by way of the errors analyzed *supra* in appellant's first and second assignments of error. Accordingly, appellant's convictions must be reversed, and this case must be remanded for a new trial.

As such, we need not address appellant's fifth assignment of error dealing with manifest weight of the evidence. As for appellant's sixth assignment of error dealing with the maximum sentence for the aggravated theft conviction, although the issue is not certain to arise again, we point the trial court to R.C. 2929.14(C), 2929.19(B)(2) and *State v. Edmonson* (1999), 86 Ohio St.3d 324, 329, 715 N.E.2d 131, 135. We shall now address appellant's third assignment of error as the issue will arise in a new trial on remand.

### ASSIGNMENT OF ERROR NUMBER THREE

Appellant's third assignment of error contends:

"The lower court erred by not instructing the jury as to all of the elements of the offenses charged."

Appellant notes that he was convicted of aggravated theft due to the value of all of the checks cashed. He points out that the state presented direct evidence only that he was present at the first deposit. As such, he claims that the court should have instructed the jury that the state must prove that appellant was responsible for the cashing of each check. At trial, appellant asked for an instruction that the state must prove his identity as to each act alleged to be committed.

The court instructed the jury that it must find appellant guilty of each and every element of each offense beyond a reasonable doubt. Each element of each offense was then read to the jury. The verdict form was explained to the jury. As to theft, this form contained various choices of monetary ranges. Hence, the jury could choose the range that coincided with the amount it believed appellant was responsible for stealing. The elements of theft read to the jury were as follows: with purpose to deprive the owner, knowingly exert control over property of another without consent. R.C. 2913.02(A). Appellant was present at the first deposit of a check payable to Ms. DeCianno into appellant's Wellness Center account. All or part of each subsequent check was deposited into his

business account, and withdrawals of the deposited money were made by him from this account. Pursuant to the statutory elements of theft, the state was not required to prove his presence at each transaction to prove theft. As such, the court was not required to instruct the jury that it must find that appellant was present at or otherwise caused each deposit in order to find him guilty of theft of the proceeds. This assignment of error is overruled.

For the foregoing reasons, the judgment of the trial court is hereby reversed, and this cause is remanded for a new trial.

*Judgment reversed*
*and cause remanded.*

GENE DONOFRIO and WAITE, JJ., concur.