The STATE of Ohio, Appellee,

v.

WILKINS, Appellant.

[Cite as *State v. Wilkins,* 183 Ohio App.3d 824, 2009-Ohio-4575.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 22834.

Decided Sept. 4, 2009.

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and R. Lynn Nothstine, Assistant Prosecuting Attorney, for appellee.

Mark A. Fisher, for appellant.

BROGAN, Judge.

{¶ 1} Keison Wilkins appeals from his conviction and sentence for one count of improper discharge of a firearm at or into a habitation, with accompanying firearm specification; one count of having a weapon while under disability, with accompanying firearm specification; and two counts of felonious assault, each with accompanying firearm and repeat-violent-offender specifications. Several trials later, Wilkins was found guilty of these offenses and sentenced to a total of 42 years in prison.

{¶ 2} In support of his appeal, Wilkins contends that the prosecutor violated Crim.R. 16 by disclosing his intention to call a witness only four days before trial. Wilkins next contends that the trial court should have ordered a mistrial after his right to self-representation, under the Sixth Amendment of the United States Constitution, was prejudiced by his collapse during trial. He also contends that the verdict is not supported by sufficient evidence and is contrary to the manifest weight of the evidence. Finally, Wilkins contends that under *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, the trial court was not permitted to impose an add-on sentence for a repeat-violent-offender specification. We will affirm.

## I

{¶ 3} On the evening of April 27, 2004, William Prigmore was driving around with his friend, Keison Wilkins. Wilkins had previously told Prigmore that Wilkins's friend, Chuck, had offered him $10,000 to kill a man named Reginald Brooks. Chuck believed that Brooks had had something to do with his (Chuck's) getting shot earlier that year. In addition to the money, Wilkins had his own reason for harming Brooks. In the early 90s, Wilkins and Brooks had been codefendants convicted of robbery and had been sent to prison, but Brooks received a lighter sentence. While Prigmore and Wilkins were driving, Wilkins's cell-phone rang. After he hung up, Wilkins told Prigmore that it was Chuck. Chuck, he said, had just told him that Brooks would be working on one of Brooks's houses the next day on Faulkner Avenue and driving a Lexus. "I'm going to get him tomorrow," Wilkins told Prigmore.

### The shooting

{¶ 4} The next day, April 28, Brooks stopped by the house he owned at 730 Faulkner Avenue. He was remodeling it and wanted to check on the progress. Anita Steward, a friend of Brooks, brought some food to the house, which the two ate inside. When they were finished, Brooks and Steward left the house and crossed the street to Brooks's Lexus. A man dressed in black and carrying an assault rifle paused behind a truck parked on the street nearby and watched them. After they got into the car, the man pointed the rifle at the Lexus and pulled the trigger.

{¶ 5} Brooks and Steward were just about to pull away, when the first bullets hit. They ducked down, and Brooks reached under the floor mat and grabbed his gun. Keeping his head down, Brooks lifted the gun and began firing blindly in the direction of the shooter. At some point, he was briefly able to peer over the dashboard to get a look at the man. When the shooter stopped to reload, Brooks exited the bullet-ridden car. Brooks saw the shooter coming around the truck, and he raced across the street, firing as he ran. Brooks ran back inside the house, where Steward also had run, and Brooks called 911, telling the operator, "730 Faulkner, black guy, hooded mask, his name is Keison Wilkins." Brooks had recognized Wilkins. When the police arrived, Brooks told them, too, that Wilkins had been the shooter.

{¶ 6} That night, Prigmore received a call from Wilkins. Wilkins told him that he had not succeeded in killing Brooks, and he asked Prigmore to meet him at an apartment. Prigmore arrived in time to see Wilkins take off a black hoodie, black pants, and a bullet-proof vest. Then Chuck pulled up. Chuck was angry, and he and Wilkins started arguing about Wilkins's failure to do the job. Chuck told Wilkins that he was going to give him only $1,500. After further argument, Prigmore watched Chuck throw the money at Wilkins, and he heard Wilkins tell

Chuck that his gun was under the couch. Prigmore then watched as Chuck pulled an assault rifle out from under the couch. After Chuck left, Wilkins described the events of the shooting to Prigmore. Prigmore expressed puzzlement as to how Wilkins missed at such close range. Wilkins replied, "I don't [know] if you ever shot a[n] automatic weapon before but it's so hard to control it be flying everywhere. That's why I couldn't hit him."

{¶ 7} A police investigation found numerous bullet holes in the car and spent casings from an SKS or AK–47 assault rifle on the sidewalk. Police also found a bullet hole in the spouting on a nearby residence along with a bullet divot in the brick of one of the home's porch supports. When police tried to arrest Wilkins on May 24, 2004, he fled into the apartment. When they finally captured him, Wilkins lied to the police about his name. Inside the apartment, police found the bullet-proof vest that Prigmore described seeing.

{¶ 8} Wilkins was indicted on one count of having a weapon while under disability, accompanied by a three-year firearm specification; one count of improperly discharging a firearm at or into a habitation, accompanied by a three-year firearm specification; and two counts of felonious assault with a deadly weapon, each accompanied by a three-year firearm specification and a repeat-violent-offender specification. Wilkins was also indicted on charges related to a separate incident, which is not relevant here.[1]

### The trials

{¶ 9} A jury trial commenced in December 2004 on the felonious-assault and improper-discharge-of-a-firearm charges, along with the accompanying firearm specifications. The charge of having a weapon under disability, its accompanying firearm specification, and the repeat-violent-offender specifications were tried to the judge. The jury was unable to reach a verdict, so the trial judge declared a mistrial on all the charges. A second trial was held in January 2005, which likewise divided the charges between judge and jury. At the conclusion, Wilkins was found guilty of all the charges and specifications—those before both the judge and jury. The trial court sentenced him to a total of 24 years in prison. We, however, finding that he had received ineffective assistance of counsel,

---

1. The other charges were an additional count of felonious assault with a deadly weapon, accompanied by a three-year firearm specification and a repeat-violent-offender specification; an additional count of having a weapon while under disability, accompanied by a three-year firearm specification; two additional counts of having a weapon while under disability, each accompanied by a one-year firearm specification; and one count of burglary, accompanied by a three-year firearm specification. The prosecution dismissed the burglary count, and two of the counts of having a weapon while under disability, along with the accompanying one-year firearm specifications. The remaining felonious-assault charge and disability charge stemmed from a separate shooting incident. See our decision in *State v. Wilkins*, Montgomery App. No. 21562, 2007-Ohio-2962, 2007 WL 1720476, for a discussion of this incident.

reversed his conviction and sentence and remanded the case. *State v. Wilkins,* Montgomery App. No. 21562, 2007-Ohio-2962, 2007 WL 1720476. In June 2008, Wilkins was tried a third time on the same charges. This time, despite the trial judge's repeated cautions, Wilkins exercised his right to represent himself. Just in case, the trial court appointed stand-by counsel to assist him.

**The collapse**

{¶ 10} Near the end of the trial, something unusual occurred during Wilkins's cross-examination of the prosecution's rebuttal witness. The court reporter recorded it this way:

{¶ 11} "[Wilkins]: She never provided with you—excuse me, hold for a second. Your Honor, excuse me for a second, I need some time.

{¶ 12} "(Defendant falls to the floor.)" [2]

{¶ 13} The judge immediately excused the jury from the courtroom and went off the record. Upon returning, the judge said,

{¶ 14} "The record will reflect that the jury is not present. The defendant is present and is feigning some medical condition. He has been checked out by the deputies who are medics, as well as a nurse, and it's my understanding Mr. Thompson [stand-by counsel] is also present. The defendant is present and acting rather uninterested in these proceedings. As I've advised the defendant off the record, I am proceeding given that I've been given medical information that there is nothing physically wrong with him.

{¶ 15} "Mr. Wilkins, if you persist in this behavior, sir, you will be removed and you will be waiving your right to give a closing statement. I understand that you choose not to respond to me, sir, but I know that you are hearing me."

{¶ 16} The court then permitted the prosecution to call witnesses to testify about Wilkins's medical condition. A registered nurse from the Montgomery County Jail, a deputy sheriff with some medical training, and an emergency medical technician all testified that they could find nothing physically wrong with Wilkins. For this reason, each said that based on his observations and examination, he did not see any medical reason why Wilkins could not continue to represent himself.

{¶ 17} After the prosecutor had finished his direct examination of each witness, the court asked Wilkins if he wanted to cross-examine. Wilkins never responded. Each time after receiving no response, the court gave stand-by counsel the same opportunity, and counsel did ask some questions of the first two witnesses.

---

2. Wilkins's collapse has given him the somewhat dubious distinction of YouTube celebrity. See http://www.youtube.com/watch?v=JrlVrQu_0iI.

When the trial court asked stand-by counsel if he had any questions for the final witness, counsel replied, "Yes. My only question is, is the record reflecting what he'[s] doing right now?"

{¶ 18} "THE COURT: Record should reflect that the defendant is slouching over to the side and acts like he's sleeping. His breath appears to be quite normal, it doesn't appear to be labored in any way. Is that a fair assessment, sir?

{¶ 19} "A. Yes.

{¶ 20} " * * *

{¶ 21} "(Deputy waives something under defendant's nose and defendant rouses)

{¶ 22} "THE COURT: Oh, a remarkable change. Thank you."

{¶ 23} The court then asked Wilkins if he would like to call any witnesses to testify concerning the event. Wilkins did not respond. Stand-by counsel declined to call any witnesses.

{¶ 24} The court then addressed Wilkins and gave him the choice of whether to continue his self-representation:

{¶ 25} "All right. Mr. Wilkins, as I advised you yesterday, sir, your disruptive behavior was challenging your ability to continue to represent yourself. You've been checked out by trained deputies who are medics, you've been checked out by a registered nurse, as well as an emergency medical technician, all of whom indicate that there is nothing physically wrong with you nor any reason why you couldn't continue here, sir. As I told you, sir, your Constitutional right to represent yourself is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with the rules of procedure, the substantive rules, and it sounds like you're doing exactly what the witness indicated, Mr. Prigmore indicated you said you would do, which was to make some effort to cause a mistrial.

{¶ 26} "But as I advised you sir, and as the case law is very clear about, your behavior will not cause a mistrial. It certainly may have an effect on the jury. Sir, in five minutes I'm going to start again with or without you. And if it's without you it's because it's your choice, sir. I'm going to be back in the courtroom in five minutes. You can let me know if it's your choice to continue to participate. Or if not sir, if you cannot comply with the basic rules of courtroom dignity, then you will be removed from the courtroom, sir.

{¶ 27} "I will advise the jury that it is your choice not to be present, that you are physically capable of being present, that you have been checked by medics who have indicated that there is nothing wrong with you or nothing that would

prohibit you from continuing and that this is your choice. And I will continue with closing arguments from the state and I will assume the, sir, that you have waived your right to a closing argument."

{¶ 28} Five minutes later, asking Wilkins again if he will continue, and receiving no answer, the trial court terminated his right to represent himself and appointed stand-by counsel to continue:

{¶ 29} "Okay. Mr. Wilkins, I assume from your behavior that you continue to be of the opinion that you are not going to participate in these proceedings despite what the medical professionals have indicated. Is that correct, Mr. Wilkins? From your lack of response and the record should reflect that the defendant continues to be in the chair in the same position he was in earlier. It's my understanding, however, from the deputies that the defendant has been responsive to you, is that correct? When we were off the record, is that correct?

{¶ 30} "UNKNOWN: Yes, ma'am.

{¶ 31} "THE COURT: All right. And Mr. Thompson [standby counsel] is also present. Mr. Thompson has advised me that he is prepared to go forward and complete the trial at this time. * * *

{¶ 32} "Mr. Wilkins, do you want to participate in these proceedings? Do you wish to continue to represent yourself? There being no response I am going to find that the defendant, because of his serious and obstructionous misconduct, including what appears to be—what appears to amount to feigning some medical condition that all the medical professionals have indicated is not evident, I am going to terminate the defendant's right to represent himself because of his deliberately serious and obstructionous misconduct, sir, you will no longer be permitted to represent yourself."

{¶ 33} Finally, the trial court removed him from the courtroom:

{¶ 34} "Mr. Wilkins, because of your behavior, I am going to have you removed from the courtroom, sir. Your behavior is highly inappropriate. It's obstruction-ist, it's nothing short of misconduct and in an effort to not only influence the jury but to create a mistrial. And as I advised you previously, your conduct will not do that, sir. So you're going to be removed to the jail where you will have an opportunity to observe the balance of the proceedings. And you will only be returned to the courtroom if I've been given some indication that you intend to or can comply with the rules of decorum required of every person who enters this courtroom, sir.

{¶ 35} "I'm going to find that your presence from the courtroom because of your behavior, sir, is excused. I'm having you removed as a result of your behavior."

{¶ 36} After the deputies removed Wilkins, the court recessed for lunch.

{¶ 37} When the court was back in session, it heard from a deputy sheriff who was with Wilkins during the break. He testified that Wilkins was taken back to the jail and, though he remained uncommunicative, Wilkins was cooperative and responded to the deputy's and others' requests and commands. The deputy further told the court that Wilkins had been brought back to the court and was installed in the judge's staff attorney's office where he could see and hear the proceedings. The deputy said that Wilkins remained slumped over in his chair, as he had been earlier when he was removed from the courtroom. After explaining how the trial was going to proceed, the court took a break to allow counsel to confer with Wilkins.

{¶ 38} When court resumed, counsel told the judge that Wilkins was "now lucid and is curious as to what is going on and what has gone on." Counsel further said that Wilkins told him that he passed out because of his blood-pressure medicine, which Wilkins claimed caused headaches and "spots." A police lieutenant then testified about these claims. The lieutenant said that during the lunch break, he watched a nurse take Wilkins's blood pressure. It was 144 over 82, a reading that caused the nurse no concern for his safety or well-being. The lieutenant also said that he reviewed Wilkins's medical records with both a nurse and a medic. The records revealed that while he was supposed to be taking blood-pressure medication daily, he had refused to do so some days. The lieutenant testified that Wilkins did not take it on the morning of June 17 and refused to take it on the 18th and 19th. While he took it on the 20th, 21st, and 22nd, Wilkins did not on the 23rd. Finally, on the 24th, 25th, and 26th, Wilkins again refused his medication.

{¶ 39} Hearing this testimony, the trial court again concluded that Wilkins's behavior was solely an effort to be disruptive. Counsel asked the court to grant a mistrial, but the court overruled the request. The jury was brought in, and the court cautioned them that Wilkins's guilt or innocence was to be determined by the evidence, not his behavior.

{¶ 40} The jury found Wilkins guilty of all the charges—improper discharge of a firearm and felonious assault, along with their respective firearm specifications—and the trial court found him guilty of having a weapon while under disability, along with the accompanying firearm specification, and found that he was a repeat violent offender. The trial court sentenced Wilkins to 32 years in prison for the offenses and firearm specifications. The court also imposed a ten-year add-on sentence based on the repeat-violent-offender specification, bringing the total sentence to 42 consecutive years. Wilkins appeals from his conviction and sentence.

## II

**First Assignment of Error**

{¶ 41} "The trial court abused its discretion by failing to exclude the testimony of William Prigmore."

{¶ 42} Wilkins contends that the prosecutor violated Crim.R. 16(B)(1)(e) by disclosing his intention to call Prigmore as a witness only four days before trial. The prosecutor then added insult to injury, Wilkins contends, by failing to disclose the breadth of Prigmore's testimony. The state responds that the prosecutor found out about Prigmore only six days before trial and made a good-faith effort to communicate quickly his intention. We find no discovery violation.

{¶ 43} Contrary to Wilkins's assertion, a prosecutor does not violate Crim.R. 16(B)(1)(e) simply by disclosing his intention to call a witness only a few days before trial. According to Crim.R. 16(B)(1)(e), upon request, a prosecutor must "furnish to the defendant a written list of the names and addresses of all witnesses whom the prosecuting attorney intends to call at trial." Crim.R. 16(D) converts this ostensible one-time disclosure into a continuing duty: whether "prior to or during trial," when the prosecutor discovers additional witnesses that he intends to call, "he shall promptly make such matter available for discovery or inspection or notify the other party or his attorney or the court of the existence of the additional matter." Id. The discovery issue here, then, is whether the prosecutor failed to meet his continuing duty to disclose by failing to act promptly.

{¶ 44} On the first day of trial, June 23, in a brief colloquy, the prosecutor told the trial court that on June 18, a person called him and identified Prigmore, who was in prison with his friend Wilkins at the time, as a potential witness. Although the case had been tried several times before, the prosecutor said that he did not know about Prigmore until that day. The prosecutor filed an amended witness-list with the trial court on the same day. Wilkins's stand-by counsel picked up the amended list from the prosecutor on the 19th and gave it to Wilkins during a visit on the 20th. The prosecutor told the court that he (the prosecutor) did not in fact speak to Prigmore until the 20th. The prosecutor also said that he had made arrangements for Wilkins to question Prigmore. The trial court found that the prosecutor had acted in good faith in disclosing Prigmore and permitted him to testify the following day.

{¶ 45} The concern with violations of the continuing duty to disclose is that it will result in unfair "trial by ambush." *State v. Wilson* (1987), 30 Ohio St.3d 99, 102, 30 OBR 356, 507 N.E.2d 1109. Here, there is no evidence that the prosecution was trying to conduct this type of trial. The prosecutor disclosed Prigmore in a reliable and expedient manner, to both the trial court and Wilkins,

and made him available for Wilkins to question. Thus, the prosecutor cannot be said to have failed to respond to Wilkins's discovery request, and therefore, he did not violate Crim.R. 16. We note also that Wilkins never asked the court to continue the trial to give him time to investigate.

{¶ 46} The issue would be different if, as Wilkins asserts, the prosecutor had violated the discovery rules. Crim.R. 16(E)(3) gives a trial court discretion in fashioning a remedy for discovery violations. If there had been a violation, the issue now would be whether permitting Prigmore to testify nevertheless was an abuse of discretion. See *State v. Parson* (1983), 6 Ohio St.3d 442, 445, 6 OBR 485, 453 N.E.2d 689. This was the issue in *State v. Scudder* (1994), 71 Ohio St.3d 263, 269, 643 N.E.2d 524, which Wilkins suggests should control here. There, after the trial had already started, the prosecutor called a witness not on the witness list, and the trial court permitted the testimony. The court said that the prosecutor did violate Crim.R. 16 but that the trial court did not abuse its discretion by permitting the testimony nevertheless. *Scudder* is distinguishable, of course, because here, as we said, the prosecutor did not violate Crim.R. 16. The need for the trial court to fashion a discretionary remedy for a violation never arose.

{¶ 47} Finally, Wilkins also contends that the prosecutor violated Crim.R. 16 by failing to disclose the expected breadth of Prigmore's testimony. During the colloquy, the prosecutor gave a general outline of the testimony he expected from Prigmore, though not all the testimony the prosecutor would later elicit. Wilkins does not point to the division of Crim.R. 16, or any other authority, that requires a prosecutor to provide a defendant with a summary of each witness's expected testimony. There is none.

{¶ 48} The first assignment of error is overruled.

**Second Assignment of Error**

{¶ 49} "The trial court abused its discretion in denying the appellant's motion for a mistrial."

{¶ 50} Wilkins next contends that the trial court should have granted his motion for a mistrial. His collapse, he argues, adversely affected his right to represent himself. Alternatively, Wilkins argues that the court should have granted a mistrial because he failed to represent himself properly. We reject both arguments.

{¶ 51} Whether to grant a mistrial is a question left in the discretion of the trial court, and the court's decision will not be disturbed on appeal absent a finding that the decision constitutes an abuse of discretion. *State v. Locklin,* Montgomery App. No. 21224, 2006-Ohio-3855, 2006 WL 2105226, at ¶ 11. An

abuse of discretion "implies an arbitrary, unreasonable, unconscionable attitude on the part of the court." (Citations omitted.) Id. Alone, an irregularity during trial is generally not grounds for ordering a mistrial. The irregularity must have adversely affected a substantial right of the accused. *State v. Reynolds* (1988), 49 Ohio App.3d 27, 33, 550 N.E.2d 490.

{¶ 52} Just before Wilkins was removed from the courtroom, the trial judge said that "the record should reflect the defendant is being videotaped now. So the court of appeals will be well aware of his conduct." We have watched the videotape, and it is apparent not only from the judge's words but also from her tone, that from the beginning, she believed that Wilkins was putting on a show. The judge had grounds for this belief, however. Earlier, Prigmore had testified that Wilkins told him that if he (Wilkins) thought that he was losing the trial, he "would try to do something to get a mistrial." The judge's belief no doubt grew firmer as she heard three medically trained professionals testify that, after examination, they could find nothing physically wrong with Wilkins. The judge heard that Wilkins was responsive to commands from officers. And she heard testimony from a police officer who watched Wilkins quickly recover when stand-by counsel walked into the room, though he had been slumped in his chair and uncommunicative since his collapse. Finally, the judge experienced Wilkins's refusal to respond.

{¶ 53} Wilkins contends that his collapse adversely affected only his right to represent himself. He argues that he was unable to finish his cross examination and unable to make a closing statement. The trial court, Wilkins argues, should have had him examined by a medical doctor and continued the trial until he was able to resume. In response, the state cites our decision in *State v. Greathouse*, Montgomery App. No. 21536, 2007-Ohio-2136, 2007 WL 1297181, in which we affirmed a trial court's decision not to grant a mistrial. There, the defendant violently overturned the defense table and then moved for a mistrial. We said that the defendant should not be permitted to profit from his voluntary and physically disruptive behavior. Wilkins responds that *Greathouse* is distinguishable because, while in *Greathouse* the defendant's behavior was voluntary, Wilkins's collapse was the result of a medical condition. It was not Wilkins's collapse, however, that adversely affected his right to self-representation. While a defendant does have the constitutional right to represent himself, "the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." (Citation omitted.) *Faretta v. California* (1975), 422 U.S. 806, 834, 95 S.Ct. 2525, 45 L.Ed.2d 562, fn. 46. "The right of self-representation," said the court, "is not a license to abuse the dignity of the courtroom." Id. The transcript reveals that despite her belief that Wilkins's collapse was feigned, the trial judge was willing to allow him to continue his self-

representation. Moreover, the judge gave Wilkins numerous opportunities to speak, to explain what he believed his medical condition was, and to ask the court for time to be examined by a medical doctor. Wilkins chose simply not to respond. We note that even if it were a genuine medical condition that caused Wilkins to fall, the evidence shows that the condition struck him neither deaf nor dumb. What prejudiced Wilkins's right, then, was not his collapse, but his refusal to respond after the collapse. This behavior, though not physically disruptive like the defendant's behavior in *Greathouse*, was no less voluntary and no less disruptive. It was for this reason that the court terminated Wilkins's right to represent himself and refused to grant a mistrial. The court did not abuse its discretion.

{¶ 54} Wilkins alternatively argues that the trial court should have granted a mistrial because he failed to represent himself properly during his examination of the prosecution's witnesses. A defendant who exercises his right to appear pro se "cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" *Faretta*, 422 U.S. at 834, 95 S.Ct. 2525, 45 L.Ed.2d 562, fn. 46. Upon reviewing the transcript, we see that the trial court repeatedly warned Wilkins of the dangers of self-representation. The court appointed stand-by counsel and gave Wilkins numerous opportunities, even after the trial had begun, to withdraw and allow counsel to continue his defense. Yet Wilkins persisted, despite the court's frequent warnings. With rights come unseverable responsibilities. Wilkins, in choosing to exercise his right to self-representation, must accept responsibility for the consequences of his choice.

{¶ 55} The second assignment of error is overruled.

**Third Assignment of Error**

{¶ 56} "The trial court erred in convicting appellant as such convictions were not sufficiently supported by the evidence and were against the manifest weight of the evidence."

{¶ 57} Wilkins contends that the evidence is insufficient to prove that he was the shooter. He argues that the police never recovered a weapon or any other physical evidence that links him to the shooting. The prosecution's case, he argues, was based solely on Brooks's identification. Wilkins acknowledges Prigmore's testimony but says that Prigmore should not have been permitted to testify (a contention we rejected in the first assignment of error) and that the testimony he did give was unreliable. We conclude that the evidence is both sufficient for and consistent with the jury's verdict.

{¶ 58} Questions of sufficiency and weight are separate and distinct inquiries. The issue with respect to sufficiency is "[w]hether the evidence is legally

sufficient to support the jury verdict as a matter of law." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 259–260, 574 N.E.2d 492. By contrast, "[w]eight of the evidence concerns the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other." (Citation omitted.) *Thompkins,* at 387, 678 N.E.2d 541. Under the weight-of-the-evidence standard, an appellate court "must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Adrian,* 168 Ohio App.3d 300, 2006-Ohio-4143, 859 N.E.2d 1007, at ¶ 6, quoting *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. Yet because the jury saw and heard the witnesses, the appellate court accords substantial deference to its determinations of weight and credibility. *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288, 1997 WL 476684. While remembering the analytical distinctions between these two inquires, we will discuss them together.

{¶ 59} The primary inculpatory evidence comes from the testimony of Brooks and Prigmore. Wilkins offered the conflicting exculpatory testimony of one alibi witness. Brooks, who has known Wilkins for over a decade, saw Wilkins's face and consistently identified Wilkins as the shooter—he never suggested anyone else. Already in the 911 call Brooks made right after the shooting, he told the dispatcher that Wilkins was the shooter. Prigmore and Wilkins had been friends since 2001. Prigmore testified that Wilkins told him that he wanted to kill Brooks. He testified that Wilkins's friend Chuck had offered Wilkins $10,000 to kill Brooks. In the evening that followed the shooting, Prigmore said, Wilkins called him and told him that he had failed to kill Brooks. Prigmore heard the argument between Wilkins and Chuck and watched Chuck give Wilkins $1,500. Before Chuck left, Prigmore watched as Chuck pulled a gun out from under the couch—an assault rifle like the one used in the shooting.

{¶ 60} Wilkins presented the testimony of Syreeta Scruggs, a long-time friend, who testified that Wilkins had driven with her to Akron the day before the shooting and remained in Akron the next day. She admitted, however, that she was not actually with Wilkins on the day of the shooting because she drove back to Dayton for a meeting with her parole officer. Also, Prigmore testified that when he and Wilkins talked about trial strategy, Wilkins told him that Scruggs was going to lie and say that on the day of the shooting, he was in Akron.

{¶ 61} To determine whether the evidence is sufficient to support the finding that Wilkins was the shooter, we must examine it in the light most favorable to the state. This means that we assume that the testimony of the state's witnesses is true, rendering questions of credibility and weight irrelevant. Brooks's eyewitness identification of Wilkins as the shooter, if believed, is alone sufficient evidence for a reasonable person to conclude beyond a reasonable doubt that Wilkins is the "person" who committed the offenses. Adding Prigmore's testimony only strengthens this conclusion. For the two reasons already identified, we do not think that the jury was wrong to reject Scruggs's conflicting alibi testimony. The remaining evidence all weighs in favor of the jury's finding that Wilkins was the shooter. Upon reviewing the evidence, we do not think that the jury lost its way and created a miscarriage of justice that demands reversal.

{¶ 62} The third assignment of error is overruled.

**Fourth Assignment of Error**

{¶ 63} "The trial court erred in imposing an additional ten years to the sentence of the appellant on the repeat violent offender specification."

{¶ 64} Wilkins contends that *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, eliminated sentences for repeat violent offenders by excising former R.C. 2929.14(D)(2) in its entirety. He argues that the trial court, therefore, had no authority to impose such a sentence on him.[3]

{¶ 65} This assignment of error is overruled based on the Ohio Supreme Court's decision in *State v. Hunter*, 123 Ohio St.3d 164, 2009-Ohio-4147, 915 N.E.2d 292, which affirmed the imposition of an enhanced sentence for a repeat-violent-offender specification. The court concluded that "*Foster* excised judicial factfinding from former R.C. 2929.14(D)(2) but did not eliminate the repeat violent offender specification." Id. at ¶ 27. In other words, *Foster* did not excise the entire statutory division but "only the portions * * * that required judicial factfinding." Id. "We never," said the court, "specifically precluded a trial court from imposing enhanced penalties for a repeat violent offender specification." Id.

### III

{¶ 66} The first, second, third, and fourth assignments of error are overruled. Therefore, the judgment of the trial court is affirmed.

Judgment affirmed.

GRADY and DINKELACKER, JJ., concur.

---

**3.** We note that soon after *Foster* was decided, the General Assembly radically amended R.C. 2929.14(D)(2)(b). Because the offenses for which Wilkins was convicted took place in 2004, the sentencing statute in effect at that time applies.

PATRICK T. DINKELACKER, J., of the First District Court of Appeals, sitting by assignment.

