[Cite as *State v. Koch*, 2019-Ohio-4099.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28000 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-1987/3 |
| | : | |
| IZMIR KOCH | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 4th day of October, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

ANTHONY R. CICERO, Atty. Reg. No. 0065408, 500 East Fifth Street, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant Izmir Koch (hereinafter "Izmir") appeals from his conviction for one count of felonious assault (deadly weapon), in violation of R.C. 2903.11(A)(2), a felony of the second degree; and one count of felonious assault (serious physical harm), in violation of R.C. 2903.11(A)(1), also a felony of the second degree. Izmir filed a timely notice of appeal with this Court on May 18, 2018.

{¶ 2} The record establishes that the victim, Aydin Akhmdov, emigrated from Russia to the United States in 2006, eventually settling in Dayton, Ohio. Aydin was initially self-employed as a truck driver. During this time, Aydin stored his truck and had it serviced at Ameripro Logistics, a local trucking company owned and managed by Mustafa Shakhmanov, Izmir's cousin. At some point thereafter, Mustafa hired Aydin as a driver for Ameripro. Aydin testified that, in 2015, he broke his leg and was unable to maintain his employment with Ameripro. Aydin testified that when he stopped working for Ameripro, he was still owed approximately $1,800 in back pay.

{¶ 3} Aydin testified that for several months, he contacted Mustafa many times in an effort to recover his back pay. Thereafter, on June 7, 2016, Aydin made multiple attempts to contact Mustafa regarding his back pay, but his calls went unanswered. Eventually, Aydin called Ameripro's truck dispatcher, Sevil Shakhmanov, Mustafa's brother. Aydin testified that Sevil told him to come to the Ameripro office and speak directly to Mustafa in order to get his back pay. Aydin testified that he traveled to Ameripro later that day, but the doors were locked and he was unable to locate anyone. Aydin testified that it was only after he left Ameripro that he noticed that Sevil had called him several times. Aydin called Sevil back and was told to return to Ameripro if he wanted to be paid.

{¶ 4} Surveillance cameras located outside the Ameripro office recorded the encounter between Aydin, Sevil, and members of Sevil's family. In the video, Aydin can be seen arriving at Ameripro and parking his motor vehicle on the street across from the business. Aydin testified that, as he sat in his parked car, he observed Sevil remove a tire iron from his car and hide it in his pants. The video depicts Sevil being joined by Mustafa, and the two men can be seen attempting to call Aydin across the street. Aydin testified that when he refused to come across the street, Sevil, Mustafa, and their brother, Sobir Shakhmanov, walked across the street to where Aydin was standing.

{¶ 5} As depicted in the video, while the three men were talking to Aydin, Izmir and his brother, Murad Koch pulled up in a white BMW sedan behind where all of the men were talking. At that point, the men surrounded Aydin. As Aydin attempted to walk away from the men, Murad ran toward him and repeatedly hit him with a collapsible metal baton. As Aydin ran between some vehicles parked nearby, all five men followed him and began beating him. Aydin testified that, during the assault, Sevil struck him in the head with a tire iron. Eventually, Aydin was able to return to his vehicle and leave the scene of the assault. However, as Aydin was driving away, the video depicts Mustafa picking up a rock and throwing it at Aydin's vehicle.

{¶ 6} Shortly thereafter, Aydin returned to Ameripro, parking his vehicle across the street from the business. Aydin testified that he shouted at Sevil from across the street regarding the back pay he was owed. The video depicts Sevil responding by making a profane gesture directed at Aydin. In the video, the Shakhmanov brothers can also be seen in the Ameripro lobby placing metal poles and rebar just inside the door of the business.

{¶ 7} Aydin testified that Murad, armed with the metal baton, began yelling at him from across the street. At that point, Murad, Izmir, and Sevil walked across the street to where Aydin was standing. Aydin testified that they were yelling at him as they approached him, stating that they were going to "tear him to pieces." Tr. 794. When Murad approached him with the metal baton, Aydin pulled out a pocketknife and stabbed him in the arm. Thereafter, Aydin attempted to run away but tripped and fell down in the parking lot, at which point Mustafa began striking him with a metal pole and Izmir can be seen kicking him in the head and upper body. Aydin testified that Sevil was about to hit him with a metal pole. Aydin, however, was able to retrieve a set of brass knuckles from his pocket and strike Sevil, knocking him to the ground. Aydin then ran across the street towards the Ameripro office in an effort to escape from his attackers.

{¶ 8} Upon reaching the parking lot in front of Ameripro, however, Aydin was struck in the head from behind with a metal pole by Murad. When Aydin fell to the ground, Murad, Mustafa, and Kamil Abbasov began hitting him with metal poles. Izmir, who did not have a weapon, can be seen in the video kicking Aydin in the head. Thereafter, Sobir Shakhmanov pulled his brothers and cousins away from Aydin, who was clearly injured. Eventually, Aydin was able to stand up and walk back across the street toward his vehicle.

{¶ 9} Izmir followed Aydin across the street and continued assaulting him. Izmir's brother, Baris Koch, joined in the assault, kicking Aydin in the head and knocking him to the ground. Mustafa, Murad, and Kamil also ran across the street to continue attacking Aydin. The video depicts the men chasing Aydin behind a wooden fence where the assault continued, according to Aydin. Eventually, Aydin walked out from behind the fence without his shirt and wearing only one shoe. Aydin walked to his vehicle and got

inside, but when he tried to leave, Izmir walked over to the vehicle, reached into the front passenger side window and took the key out of the ignition. Thereafter, Aydin simply remained seated in his vehicle and waited for the police to arrive.

{¶ 10} During the initial assault, Aydin suffered a cut to his head when Sevil struck him with a tire iron. Aydin required stitches and staples to close wounds on his head. Furthermore, as a result of the assaults, Aydin was diagnosed with post-concussive syndrome, anxiety, and post-traumatic stress disorder. Aydin testified that as a result of the assault, he continues to suffer from headaches, knee pain, and back pain.

{¶ 11} On July 5, 2016, Izmir and five co-defendants were indicted for one count of felonious assault (deadly weapon), and one count of felonious assault (serious physical harm).[1] On August 10, 2016, Izmir filed a motion to suppress his statements to the police. On December 2, 2016, Izmir filed an amended motion to suppress in which he argued that Mustafa, the manager of Ameripro, did not give valid consent for the police to seize the surveillance video without a search warrant. On February 14, 2018, the trial court overruled Izmir's motion to suppress on the following grounds: Izmir lacked standing to challenge the video's seizure because he failed to adduce evidence establishing that he had a reasonable expectation of privacy in Ameripro's business property and/or the particular office where the surveillance video was maintained; and 2) even if Izmir had standing, the record established that Mustafa voluntarily provided the police with both oral and written consent to seize the surveillance video.

{¶ 12} The trial court initially intended to give each co-defendant a separate trial.

---

[1] Izmir was indicted along with his brothers, Murad and Baris, and his cousins, Mustafa, Sobir, and Sevil. Kamil was indicted on July 20, 2016.

On November 8, 2017, Izmir filed a motion requesting that he and his brother, Murad, be tried together, which the trial court granted. Eventually, co-defendants Sevil and Kamil were also joined. On March 19, 2018, Izmir, Murad, Sevil, and Kamil's jury trial commenced. After hearing testimony and seeing evidence adduced by the State and the defendants, the jury found Izmir and his co-defendants guilty of one count of felonious assault (deadly weapon) and one count of felonious assault (serious physical harm). The trial court sentenced Izmir to a term of community control sanctions not to exceed five years.

{¶ 13} It is from this judgment that Izmir now appeals.

{¶ 14} Izmir's first assignment of error is as follows:

THE TRIAL COURT ERRED BY HOLDING THAT APPELLANT COULD NOT MOVE TO SUPPRESS EVIDENCE IN THIS MATTER BECAUSE HE DID NOT HAVE A PERSONAL EXPECTATION OF PRIVACY AT THE BUSINESS FROM WHICH THE SURVEILLANCE VIDEO WAS OBTAINED, IN VIOLATION OF HIS RIGHTS UNDER THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTION 14 OF THE CONSTITUTION OF OHIO.

{¶ 15} In his first assignment of error, Izmir contends that the trial court erred when it overruled his motion to suppress the surveillance video seized by police from Mustafa's office at Ameripro. Specifically, Izmir argues that the trial court erred when it found that he lacked standing to challenge the video's seizure because he failed to establish that he had a reasonable expectation of privacy in Ameripro's business property and/or the particular office where the surveillance video was maintained.

{¶ 16} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 17} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Fourth Amendment rights are personal in nature, and they may not be asserted vicariously by third parties. *Rakas v. Illinois*, 439 U.S. 128, 133-34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). "A person aggrieved by the introduction of evidence secured by an illegal search of a third person's premises or property has not suffered any infringement upon his [or her] Fourth Amendment rights." *State v. Henderson*, 2d Dist. Montgomery No. 22062, 2008-Ohio-1160, ¶ 9, citing *Rakas* at 134.

{¶ 18} A reasonable expectation of privacy under the Fourth Amendment may extend to businesses and commercial premises as well as to private homes. *See v. City of Seattle*, 387 U.S. 541, 543, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). Employees may have some expectation of privacy in their workspace, and therefore, often have standing to assert a Fourth Amendment violation. *Mancusi v. DeForte*, 392 U.S. 364, 369, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). Whether an employee had a reasonable expectation of

privacy in order to have standing to object to a search of his or her workplace is decided on a case by case basis. *O'Connor v. Ortega,* 480 U.S. 709, 718, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). In some situations, an independent contractor has less right to object to a search than would an employee, but these situations are also reviewed on a case by case basis. *See, e.g., Donovan v. A.A. Beiro Constr. Co. Inc.*, 746 F.2d 894 (D.C.Cir.1984); *Wilson v. Moreau*, 440 F.Supp.2d 81 (D.R.I.2006).

{¶ 19} The record establishes that Ameripro was a limited liability company incorporated in Ohio by Mustafa; Mustafa was listed as Ameripro's registered agent. At the hearing on the motion to suppress, Mustafa testified that he was in charge of the day-to-day operation of Ameripro, and that his brothers, Sobir and Sevil, helped him manage the company. Conversely, Izmir was employed by a separate company, USA Freight, which was owned by Izmir's father and operated by the Koch family. Mustafa testified that, although he provided Izmir and the other Koch brothers with swipe cards which allowed them to gain entrance to Ameripro grounds and keys to the side and back doors of the office, neither Izmir nor any of his brothers was involved in the day-to-day operation of Ameripro. Additionally, while Izmir had general access to parts of the Ameripro grounds and office, no evidence was adduced that Izmir had any access to Mustafa's office, where the video surveillance system was maintained.

{¶ 20} In his brief, Izmir asserts that "the [Koch] brothers, including [Izmir], had access to the room in which the video surveillance equipment for [Ameripro] was maintained and operated." Appellant's Amended Brief, p.12. In support of his argument in this regard, Izmir cites to pages 304 and 321-322 of the transcript of the suppression hearing. Upon review, however, none of the pages to which Izmir directs us support his

contention that he or any of his brothers had access to the room where the video surveillance equipment was maintained and operated. Mustafa testified that the video surveillance equipment was maintained in his personal office. The record establishes that Mustafa was only asked about Baris Koch and the extent of his access to Mustafa's office. Mustafa testified that Baris was his cousin and had access to most of the Ameripro office and grounds. However, Mustafa specifically testified that Baris *did not* have access to the room where the video surveillance equipment was maintained and operated. Moreover, Baris's access or lack thereof was not dispositive of Izmir's access.

**{¶ 21}** Izmir also argues that Mustafa and the Shakhmanov brothers have an extremely close familial bond with all of the Koch brothers. Izmir argues that, while they are technically cousins, the Kochs and Shakhmanovs are more akin to brothers. Izmir argues that this is highlighted by the fact that Mustafa provided all of the Koch brothers with a card and keys allowing them access to the Ameripro office and grounds. However, although Izmir argues that his possession of a swipe card and keys to the office demonstrated he had a privacy expectation in the room containing the video surveillance equipment, possession of such equipment, in and of itself, did not establish a reasonable expectation of privacy in the video room. *See State v. Logel*, 2d Dist. Montgomery No. 21912, 2008-Ohio-17, ¶ 28 ("although the defendant had a key to the apartment, he demonstrated no other indicia that would suggest he had a reasonable expectation of privacy in the apartment").

**{¶ 22}** Simply put, notwithstanding the fact that Izmir had a swipe card and keys which granted him access to portions of the Ameripro office and grounds, we agree with the trial court that Izmir failed to adduce any evidence that he had an expectation of

privacy in the room containing the video surveillance equipment. It is undisputed that, as cousins of Mustafa, Izmir and Baris were granted the same level of access to the office and grounds at Ameripro. Accordingly, it was reasonable to infer that, if Baris Koch did not have access to the video surveillance room per Mustafa's testimony, then Izmir would not have had access to the room either. Izmir bore the burden to establish that he had a protected privacy right therein; he did not do so. Therefore, we find that the trial court did not err when it overruled Izmir's motion to suppress, finding that he lacked standing to challenge the video's seizure because he did not establish that he had a reasonable expectation of privacy in Ameripro's business property and/or the particular office where the surveillance video was maintained.

{¶ 23} Izmir's first assignment of error is overruled.

{¶ 24} Izmir's second assignment of error is as follows:

THE TRIAL COURT ERRED BY HOLDING THAT MUSTAFA GAVE CONSTITUTIONALLY VALID CONSENT FOR THE COLLECTION OF THE SURVEILLANCE VIDEO.

{¶ 25} In his second assignment, Izmir argues that the trial court erred when it held that Mustafa voluntarily provided the police with both oral and written consent to seize the surveillance video. However, in our analysis of the prior assignment, we found that the trial court reasonably concluded that Izmir lacked standing to challenge the video's seizure, because he failed to establish that he had reasonable expectation of privacy in Ameripro's business property and/or the particular office where the surveillance video was maintained. Because he lacked standing to challenge the seizure of the surveillance video, Izmir's second assignment is overruled as moot.

{¶ 26} Izmir's third assignment of error is as follows:

THE TRIAL COURT ERRED BY NOT DECLARING A MISTRIAL WHEN NEWS ACCOUNTS RELATING TO THE ARREST OF APPELLANT IN A SEPARATE MATTER WERE PUBLISHED DURING THE TRIAL, THEREBY VIOLATING HIS RIGHT TO DUE PROCESS OF LAW UNDER THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTION 10, OF THE CONSTITUTION OF OHIO.

{¶ 27} During the night after the second day of trial, on March 20, 2018, Izmir was arrested by the FBI and taken into custody in Cincinnati, Ohio. Therefore, Izmir was not present when the trial was set to resume the next day, March 21, 2018. When the trial court informed the parties that it was considering resuming the trial without Izmir, his counsel and counsel for each co-defendant objected. The trial court re-set the trial to the next day and sent everyone home.

{¶ 28} Izmir was present for trial on March 22, 2018. Izmir's counsel moved for a mistrial after it was discovered that the U.S. Attorney's Office had issued a press release regarding Izmir's arrest in Cincinnati, which had been reported on by several local media outlets.

{¶ 29} In overruling Izmir's motion for a mistrial, the trial court stated the following outside the hearing of the jury:

TRIAL COURT: [The record] is clear, that this is not press interest being generated by the Montgomery County Prosecutor's Office nor by the Dayton Police Department. We have a co-defendant who is attracting media interest through the Cincinnati market, and the Cincinnati

Department of Justice U.S. Attorney's Office, and/or their FBI offices.

So everybody in this room is harmless as to the situation that is arising. That is absolutely clear. And so we have third party players who are engaging in media activity that happens to have an impact on this. But nobody associated with this case is the cause – [of] the situation that we're talking about.

So I want the record and the Court of Appeals to be very clear on that, that this is not a circumstance that is being generated by the prosecutor's office in this case, nor by any local law enforcement agency. So that just – we can just put that to rest right now.

* * *

So the Court is going to deny the request for mistrials, and the rationale for doing so is that from [the] point of empanelment through all of our various recesses, including the recess that was given because of Izmir Koch's incarceration down in Cincinnati, *the jury has been told consistently and repeatedly to obey the Court's orders on recess, to have no media contact, and to not allow anybody to relate to them any reports concerning the case that might arise in the media.*

*They have also been instructed that if they would come into contact with any information regarding the case, any aspect of it, or anybody involved in it, to immediately bring that to the Court's attention.*

*The jury is presumed to be following the Court's orders. At this point no juror has indicated that to the Court's bailiff that they've had an issue*

> *with that. Nobody has asked to speak with the Court.*
>
> *So given the instructions that the jury has received and the content and breadth of those instructions, at this point I am not going to grant the request for mistrial.*
>
> So as until now having contact with the jury about whether or not they've been able to abide by the Court's instructions, in lieu of doing a one-by-one inquiry in chambers with the jury, my suggestion would be that we have the jurors go into the jury box and I ask them amass as opposed to one-on-one, have any of you had any contact with any information outside of the courtroom involving this case, any aspect of it, or anybody involved in it?
>
> And if so, I want you to raise your hand, and I'm going to have to talk with you further about that. Don't obviously blurt out anything that you've heard. And that way I do not subscribe to the view that there's a chilling effect by asking the jurors that when they're all together.
>
> * * *
>
> And then we can follow up and follow that trail where it may lead, but certainly at this point there is not enough to grant a mistrial.

(Emphasis added.) Tr. 858-860.

**{¶ 30}** At this point, the jury was brought back into the courtroom, and the following exchange occurred:

> TRIAL COURT: [Addressing the jury] So we're getting ready to resume our proceedings, and before we do that I just need to take care of

a housekeeping issue.

And so as you know, on all of our recesses, and especially on our overnight recesses I've given you those instructions about don't talk about the case, don't have contact with anybody involved in the case, and don't come into contact with any media reports that concern the case.

And I also told you that if you happen to come into contact with any information that pertains to the case or the people involved in it, you need to bring that to the Court's attention. And so it is the case that unexpectedly there has been some media coverage pertaining to the case that we're dealing with.

So that sometimes happens. We didn't anticipate that would occur, but it did occur. And so the question that I have to ask to you is whether or not any of you have happened to have any contact with any of those media reports.

And if so I'm going to need you to raise your hand. I don't want you to say anything that you heard in any such media reports, but I need to find out whether or not any of you did in fact have contact directly or indirectly with any media reports concerning the case, any aspect of it or anybody involved with it. If so, will you please raise your hand?

*Okay. And the record will reflect not a single juror is raising their hand. And they looked very perplexed as to what it is that I'm referring to, which is a great sign. That's exactly how we wanted you to react to that question, quite frankly.*

(Emphasis added.) Tr. 863-864. Thereafter, the trial court reiterated to the jury her initial instructions regarding not having any contact with media reports or anyone involved in the case, and if it that did occur, to bring it to the trial court's attention immediately. Tr. 864.

{¶ 31} "A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected; this determination is made at the discretion of the trial court." *State v. Reynolds*, 49 Ohio App.3d 27, 33, 550 N.E.2d 490 (2d Dist.1988). The granting of a mistrial is necessary only when a fair trial is no longer possible. *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991), citing *Illinois v. Somerville*, 410 U.S. 458, 462-463, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973).

{¶ 32} Whether "to grant a mistrial is a question left [to] the discretion of the trial court, and the court's decision will not be disturbed on appeal absent a finding that the decision constitutes an abuse of discretion." (Citation omitted.) *State v. Wilkins*, 183 Ohio App.3d 824, 2009-Ohio-4575, 919 N.E.2d 241, ¶ 51 (2d Dist.). A decision satisfies this standard if it evinces "an arbitrary, unreasonable [or] unconscionable attitude on the part of the court." (Citation omitted.) *Id.*

{¶ 33} Upon review, we find that the record establishes that Izmir did not demonstrate that he was prejudiced by the media reports of his arrest in Cincinnati on the night after his second day of trial in the instant case. The trial judge addressed the jury panel together regarding potential exposure to the reports and determined that the media reports had not affected the jurors' ability to decide the case fairly and impartially. The trial court's thorough voir dire dispelled any notion that the jurors had been exposed to

any prejudicial information with respect to the local media reports.

{¶ 34} Izmir also argues that he was entitled to a mistrial because the jurors may have thought the following: 1) that he "had been involved in some newsworthy, negative activity" since he had not been present in the courtroom on March 22, 2018; 2) that the trial court postponed the trial because of "unexpected delay;" and 3) that Izmir was present the next day when the trial court questioned the jurors regarding the media reports.

{¶ 35} Izmir's argument in this regard is undermined by the fact that the record establishes that, when the trial court informed the jury that the trial was being delayed until the next day, the only individuals present in the courtroom were the judge, her staff, and the jury. In an effort to avoid the jurors doing a "head count" and realizing that Izmir was not present, the trial court had all of the defendants and their counsel step outside the courtroom while she informed the jury about the one-day delay. Tr. 840-843. Accordingly, based upon the actions taken by the trial court, the jury had no way to connect Izmir to the one-day trial delay and/or the trial court's subsequent inquiry regarding the media reports.

## Juror Number Seven

{¶ 36} On the morning of the final day of trial, March 26, 2018, Juror Number Seven (hereinafter "No. 7") informed the bailiff that she had been "browsing" past editions of the Dayton Daily News over the weekend and inadvertently read a portion of an article involving Izmir being charged in another case for an offense arising out of a fight. Tr. 1354. The following exchange then occurred out of the hearing of any other jurors:

> NO. 7: And so I thought, oh, no, I've got to tell you guys in the

morning.

TRIAL COURT: Yeah, absolutely.

NO. 7: So [the article] was rather uneventful, but it was one of our co-defendants –

TRIAL COURT: Uh-huh.

NO. 7: -- *and it was a fight, and we already knew he was a fighter. We've been watching it all week.*

&ast; &ast; &ast;

TRIAL COURT: Okay.   And, of course, the question that we have for you about that circumstance is whether or not that is going to impact your ability to be a fair, neutral, and impartial juror on this particular case. And so the law goes to great lengths to make sure that individuals charged with a criminal offense are evaluated on the basis of that specific instance –

NO. 7: Uh-huh.

TRIAL COURT: -- right?   And we don't look at past or future for that particular individual.   We are just trying to zero in with laser-like focus as to this particular instance.

NO. 7: Uh-huh.

TRIAL COURT: *And so having heard that Izmir is alleged to have been involved in another altercation, does that impact your view of this case either as to him or any other individual involved in this case?*

NO. 7: *No.*

TRIAL COURT: Okay. *And is that something that you could totally and completely put aside and not consider, and decide this case exclusively on the basis of the evidence in this case?*

NO. 7: *Yes.*

TRIAL COURT: Okay. *And in following up with that, one of the most powerful forms of evidence in a case * * * is to suggest that somebody – has a particular character trait, right? A character trait for being a hothead, or a character trait for not being truthful * * * or something like that?*

NO. 7: *Uh-huh.*

TRIAL COURT: *Because it is the human mind that we tend to say, well, if you had that character on Tuesday, then you would have acted in conformity with that on Thursday for example, right?*

NO. 7: *Uh-huh. Uh-huh.*

TRIAL COURT: And so the law doesn't allow that to happen. We again take great strides to try to say that that doesn't matter, right? What he did on Tuesday doesn't matter because we are only interested in what happened on June the 7th of 2016 in this particular case.

*So are you able to not use that information that appeared in the newspaper about an allegation against someone that they were involved in a fight to [sic], quite frankly, hold that against Mr. Izmir Koch, and believe that it's more likely that he did something wrong in this particular instance? Are you able to just ignore that?*

NO. 7: *Yes, Your Honor.*

(Emphasis added.) Tr. 1354-1356.

{¶ 37} At that point, the trial court spoke with counsel for the defendants at sidebar, specifically Izmir's counsel, inquiring as to whether the parties were satisfied with the trial court's voir dire of No. 7, as well as the juror's responses. None of the parties requested a mistrial, and no one requested that No. 7 be discharged and replaced with an alternate juror. Lastly, we note that there is no indication from the record that No. 7 told any of the other jurors about the newspaper article she read about Izmir. Nevertheless, Izmir argues on appeal that the trial court should have ordered a mistrial sua sponte.

{¶ 38} Izmir failed to request a mistrial in the trial court, so he waived the issue, absent plain error. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 152; *see also State v. Garrett*, 2d Dist. Montgomery No. 27264, 2017-Ohio-8492, ¶ 16 (failure to object limited appellate review to plain error analysis).

{¶ 39} For plain error to exist, the defect in the trial proceedings must be obvious and must have affected the outcome of the trial. *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 16. "Notice of plain error 'is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 108, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 40} Upon review, we conclude that the trial court did not err, plainly or otherwise, when it failed to sua sponte order a mistrial based upon No. 7's admission that she had accidentally read part of an article discussing a separate charge involving Izmir's fight in another jurisdiction. The record establishes that the trial court engaged No. 7 in a

thorough and thoughtful inquiry which established that, although she read the article, the juror was not prejudiced against Izmir and would be able to render a fair and impartial verdict based solely upon the evidence adduced in the instant case. We also note that none of the co-defendants' attorneys or Izmir's counsel, in particular, saw fit to request a mistrial based upon No. 7's admission about the newspaper article. Rather, all of the attorneys present appeared satisfied with the trial court's inquiry and No. 7's responses. Therefore, we find that this case does not present the exceptional circumstances or manifest miscarriage of justice required to invoke the plain-error doctrine.

{¶ 41} Izmir's third assignment of error is overruled.

{¶ 42} Izmir's fourth assignment of error is as follows:

THE VERDICT OF THE COURT FINDING APPELLANT GUILTY OF FELONIOUS ASSAULT WITH A DEADLY WEAPON WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN APPELLANT DID NOT HAVE OR USE A DEADLY WEAPON.

{¶ 43} In his fourth assignment, Izmir argues that his conviction for felonious assault with a deadly weapon was against the manifest of the evidence because the surveillance video of the assault on Aydin established that he (Izmir) never possessed a weapon.

{¶ 44} "The manifest-weight-of-the-evidence standard of appellate review set forth in *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), applies in both criminal and civil cases. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17-23." *Mathews v. Mathews*, 2d Dist. Clark No. 2012-CA-79, 2013-Ohio-2471, ¶ 9.

{¶ 45} This court has stated that "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citations omitted). *State v. Jones*, 2d Dist. Montgomery No. 25724, 2014-Ohio-2309, ¶ 8. "When evaluating whether a [judgment] is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*, quoting *Thompkins* at 387.

{¶ 46} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). However, we extend less deference in weighing competing inferences suggested by the evidence. *Id.* The fact that the evidence is subject to differing interpretations does not render a judgment against the manifest weight of the evidence. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 14. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 47} In the instant case, one of the offenses of which Izmir was convicted was felonious assault in violation of R.C. 2903.11, which provides, in relevant part:

(A) No person shall knowingly do either of the following:

* * *

(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.

{¶ 48} The evidence adduced at trial established that while Izmir did not possess a deadly weapon during the assault on Aydin, several of his co-defendants did possess deadly weapons and repeatedly used those weapons to attack Aydin. Therefore, while Izmir did not use a deadly weapon in the commission of felonious assault, he was charged under that Revised Code section on a theory of complicity.

{¶ 49} "Under R.C. 2923.03, a person may be an accomplice in an offense and prosecuted as the principal offender if, among other things, he aids or abets another in committing the offense while acting with the kind of culpability required for commission of the offense." *State v. Coleman*, 37 Ohio St.3d 286, 525 N.E.2d 792 (1988), paragraph two of the syllabus. In other words, "[i]f a person acting with the kind of culpability required for the commission of an offense aids or abets another in committing the offense, that person is guilty of complicity in the commission of the offense, and shall be prosecuted and punished as if he were a principal offender." *State v. Wade*, 2d Dist. Clark No. 06-CA-108, 2007-Ohio-6611, ¶ 20, citing R.C. 2923.03(A)(2) and (F).

{¶ 50} " 'To aid or abet' means to support, assist, encourage, cooperate with, advise, or incite the principal in the commission of the crime." *Id.*, citing *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001). "Consequently, to support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the Supreme Court of Ohio has held that 'the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.' " *Id.*, quoting

*Johnson* at 245. "Ohio courts have recognized that '[e]vidence of aiding and abetting another in the commission of crime may be demonstrated by both direct and circumstantial evidence. Thus, "participation in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed." ' " *Id.*, quoting *State v. Cartellone*, 3 Ohio App.3d 145, 150, 444 N.E.2d 68 (8th Dist.1981), quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971).

{¶ 51} Upon review, the record clearly establishes that Izmir aided and abetted his co-defendants with respect to the felonious assault of Aydin with a deadly weapon. The surveillance video depicts one instance where Aydin attempted to run away after stabbing Murad, and was chased down by Izmir, Murad, Sevil, and Mustafa. After Aydin fell down in the parking lot, Mustafa began striking him with a metal pole, and Izmir can be seen kicking him in the head and upper body. Aydin then ran across the street toward the Ameripro office in an effort to escape from his attackers. Upon reaching the parking lot in front of Ameripro, however, Aydin was struck in the head from behind with a metal pole by Murad. When Aydin fell to the ground, Murad, Mustafa, and Kamil began hitting him with metal poles. Izmir, who was unarmed, can be seen kicking Aydin in the head while the other men were hitting Aydin with the metal poles. In addition to the foregoing examples depicted in the video, Izmir can be seen kicking and hitting Aydin while the other men attack Aydin with weapons in other portions of the video.

{¶ 52} Thus, having reviewed the record, we find no merit in Izmir's manifest weight challenge. It is well settled that evaluating witness credibility is primarily for the trier of fact. *State v. Brown*, 2d Dist. Montgomery No. 27571, 2018-Ohio-3294, ¶ 11; *see also State v. Benton*, 2d Dist. Miami No. 2010-CA-27, 2012-Ohio-4080, ¶ 7. A trier of fact

does not lose its way and create a manifest miscarriage of justice if its resolution of conflicting testimony is reasonable. *Id.* Here, the jury reasonably credited the State's evidence, which established that Izmir was guilty of the offenses for which he was convicted. Accordingly, the jury did not lose its way and create a manifest miscarriage of justice in reaching a guilty verdict against Izmir for felonious assault with a deadly weapon.

**{¶ 53}** Izmir's fourth assignment of error is overruled.

**{¶ 54}** Izmir's fifth assignment of error is as follows:

APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTION 10 OF THE CONSTITUTION OF OHIO WHEN HIS TRIAL COUNSEL ACQUIESCED IN THE ELIMINATION OF A JURY INSTRUCTION ON THE LESSER INCLUDED OFFENSE OF ASSAULT, DID NOT REQUEST A JURY INSTRUCTION ON NON-DEADLY FORCE SELF DEFENSE, AND DID NOT MAINTAIN SEVERANCE OF APPELLANT'S CASE, INSTEAD MOVING FOR JOINDER.

**{¶ 55}** In his fifth assignment, Izmir contends that he was denied the effective assistance of counsel based upon the following conduct of his trial counsel: 1) stipulating that Aydin suffered "serious physical harm," thereby preventing a jury instruction on the lesser included offense of misdemeanor assault; 2) failing to request a jury instruction on non-deadly force self-defense; and 3) opting for joinder instead of keeping Izmir's case severed from those of his co-defendants.

{¶ 56} We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 688. "To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. [*Strickland* at 688]. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. * * *" *State v. Mitchell*, 2d Dist. Montgomery No. 21957, 2008-Ohio-493, ¶ 31.

{¶ 57} An appellant is not deprived of effective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible trial tactic. *State v. Brown*, 38 Ohio St.3d 305, 319, 528 N.E.2d 523 (1988). The test for a claim of ineffective assistance of counsel is not whether counsel pursued every possible defense; the test is whether the defense chosen was objectively reasonable. *Strickland* at 689. A reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy. *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985). Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available. *State*

*v. Cook*, 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992).

**Stipulation to Serious Physical Harm**

{¶ 58} As previously stated, Aydin testified that, as a result of being assaulted by Izmir and the other co-defendants, he suffered a cut to his head when Sevil struck him with a tire iron. Aydin required stitches and staples to close wounds on his head. Furthermore, as a result of the assaults, Aydin was diagnosed with post-concussive syndrome, anxiety, and PTSD. Aydin testified that he continues to suffer from headaches, knee pain, and back pain as a result of the assaults.

{¶ 59} When Aydin finished testifying, the parties and the trial court discussed whether it was necessary for the doctors who treated Aydin to testify regarding the injuries he suffered during the attack. Counsel for each of the defendants and the trial court agreed that, based upon Aydin's testimony and his medical records, it was undisputed that he suffered serious physical harm as a result of being assaulted by Izmir and the other co-defendants. We note that during the same discussion, the parties and the trial court also agreed to stipulate that Murad suffered serious physical harm when he was stabbed by Aydin, and Mustafa suffered serious physical harm when he broke his hand during the assault. We also note that the trial court stated that, from its "perspective, * * * there is no doubt that the element of serious physical harm is established in connection with" the injuries Aydin suffered during the assault.

{¶ 60} Upon review, we find no fault with Izmir's counsel's decision to stipulate that Aydin's injuries constituted serious physical harm within the meaning of R.C. 2903.11(A)(1). "Serious physical harm" is defined, in part, as "[a]ny physical harm that involves acute pain of such duration as to result in substantial suffering or that involves

any degree of prolonged or intractable pain." R.C. 2901.01(A)(5)(e). The record indicates that Izmir's counsel had received Aydin's medical records during discovery, and that the nature and extent of Aydin's injuries were not in question. Thus, counsel's decision to stipulate that Aydin's injuries constituted serious physical harm was a matter of trial strategy. *See State v. Earnest*, 2d Dist. Montgomery No. 20124, 2004-Ohio-4049, ¶ 36. Even debatable trial tactics do not establish ineffective assistance of counsel. *State v. Hoffner*, 102 Ohio St.3d 358, 365, 2004-Ohio-3430, 811 N.E.2d 48; *State v. Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189 (1980). Additionally, given the trial court's opinion that the evidence clearly established that Aydin suffered serious physical harm, it is reasonable to conclude that the trial court would not have instructed the jury on the lesser included offense of misdemeanor assault even if there had been no stipulation regarding the nature of Aydin's injuries.

### Non-Deadly Force Self-Defense Instruction

{¶ 61} Izmir also argues that his counsel was ineffective for failing to request a jury instruction on self-defense through the use of non-deadly force. At trial, Izmir's defense was that he attacked Aydin in an attempt to defend his brother, Murad, after Murad had been stabbed in the arm by Aydin.

{¶ 62} " 'To establish self-defense for the use of less than deadly force in defense of one's person, the defendant must prove: (1) he was not at fault in creating the situation which gave rise to the event in which the use of non-deadly force occurred; (2) he had honest and reasonable grounds to believe that such conduct was necessary to defend himself against the imminent use of unlawful force; and (3) the force used was not likely to cause death or great bodily harm.' " *State v. Belcher*, 2d Dist. Montgomery No. 24968,

2013-Ohio-1234, ¶ 34, quoting *State v. Tanner*, 9th Dist. Medina No. 3258-M, 2002-Ohio-2662, ¶ 21.

{¶ 63} "Defense of another is a variation of self-defense. Under certain circumstances, one may employ appropriate force to defend another individual against an assault. However, 'one who intervenes to help [another] stands in the shoes of the person whom he is aiding, and if the person aided is the one at fault, then the intervenor is not justified in his use of force and is guilty of an assault.' * * * Therefore, one who claims the lawful right to act in defense of another must meet the criteria for the affirmative defense of self-defense." *State v. Wenger*, 58 Ohio St.2d 336, 340, 390 N.E.2d 801 (1979). *Accord State v. Turner*, 2d Dist. Montgomery No. 24322, 2011-Ohio-5417, ¶ 13.

{¶ 64} In the instant case, Murad was the initial aggressor in the assault on Aydin. Furthermore, Murad used a deadly weapon when he initially ran up to Aydin and struck him in the head with a collapsible metal baton. During the second part of the assault, Murad again initiated the attack on Aydin when he grabbed the metal baton out of Izmir's car and ran across the street, yelling at Aydin that he was going to "tear him to pieces."

{¶ 65} Accordingly, the record establishes that Murad was clearly at fault by initiating the attack that ultimately resulted in Aydin's acting in self-defense by stabbing Murad. Therefore, Izmir cannot establish that he was prejudiced by his counsel's decision not to request a non-deadly force self-defense jury instruction, since Izmir claimed he was coming to the defense of Murad, who was clearly using deadly force against Aydin. The evidence adduced at trial supported the trial court's decision to instruct the jury on the defense of others through the use of deadly force. Tr. 1455-1456. Izmir's trial counsel was therefore not ineffective for failing to request a jury instruction on

non-deadly force defense of others.

## Failure to Request Severance of Izmir's Case

{¶ 66} Lastly, Izmir contends that his trial counsel was ineffective for failing to request that his case be severed and tried separately from his co-defendants' cases. Specifically, Izmir argues that joinder was inappropriate because he did not have a weapon, but all of his co-defendants used weapons in the attack on Aydin.

{¶ 67} Initially, we note that the co-defendants, including Izmir, were originally scheduled to be tried separately. Several months before Izmir's trial was scheduled to begin, however, his counsel, along with Murad's counsel, filed a joint motion requesting that their cases be tried together. The trial court granted the motion, and ultimately, Izmir, Murad, Sevil, and Kamil were tried together.

{¶ 68} Joinder is governed by R.C. 2945.13, which states in pertinent part:

When two or more persons are jointly indicted for a felony, except a capital offense, they shall be tried jointly unless the court, for good cause shown on application therefor by the prosecuting attorney or one or more of said defendants, orders one or more of said defendants to be tried separately.

{¶ 69} The law favors joinder because a single trial conserves time and expense and may minimize the potentially disparate outcomes that can result from successive trials before different juries. *State v. Schiebel*, 55 Ohio St.3d 71, 86-87, 564 N.E.2d 54 (1990); *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981). However, the preference for joint trials is not unrestricted. A defendant requesting severance "has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial." *Torres* at 343.

Crim.R. 14 permits a defendant to sever his case from a co-defendant's case if joinder will result in prejudice. The rule states in pertinent part:

> If it appears that a defendant or the state is prejudiced by a joinder of * * * defendants in an indictment, * * * or by such joinder for trial together of indictments, * * *, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires.

{¶ 70} Upon review, Izmir has failed to establish that his counsel's failure to file a motion to sever would have changed the outcome of the trial. The charges in all of the indictments involved Izmir and his co-defendants acting in concert with each other. It was undisputed that each of Izmir's co-defendants used weapons while Izmir only kicked Aydin in the head and body. However, that fact standing alone did not prejudice Izmir or deny him a fair trial pursuant to Crim.R. 14. All of the same evidence and exhibits, including the Ameripro surveillance video, would have been introduced even if Izmir had been tried separately. Additionally, Aydin's testimony would have been the same in separate trials as it was in the joint trial. We also note that, when it was discovered on the third day of trial that Izmir had been arrested by the FBI and would not be available for trial that day, the trial court suggested that Izmir's case be continued so that the joint trial of the remaining co-defendants could proceed. Each of the defense attorneys, including Izmir's, objected and explained to the trial court that the defense case had been "strategically organized" insofar that trying the co-defendants' cases together was necessary for their success. Thus, it is apparent from the record that the decision of the defense attorneys to try the co-defendants' case together was a tactical decision.

Accordingly, we find that there is nothing in the record which establishes that joinder of the defendants' cases was prejudicial to Izmir, and his counsel was not ineffective for failing to request severance.

{¶ 71} Izmir's fifth assignment of error is overruled.

{¶ 72} Izmir's sixth assignment of error is as follows:

THE TRIAL COURT ERRED BY FAILING TO INSTRUCT THE JURY ON NON-DEADLY USE OF FORCE SELF DEFENSE, AND ASSAULT AND/OR AGGRAVATED ASSAULT.

{¶ 73} In his sixth assignment, Izmir argues that the trial court should have instructed the jury sua sponte on non-deadly use of force self-defense. Izmir also argues that the trial court should have instructed the jury on assault and/or aggravated assault, as lesser included offenses of felonious assault.

**Non-Deadly Use of Force Self-Defense**

{¶ 74} We note that Izmir did not request an instruction on non-deadly use of force self-defense at trial, so he waived thus issue, absent plain error. *Hunter,* 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, at ¶ 152.

{¶ 75} For plain error to exist, the defect in the trial proceedings must be obvious and must have affected the outcome of the trial. *Payne,* 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, at ¶ 16. "Notice of plain error 'is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *Lang,* 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 108.

{¶ 76} A trial court need only give those instructions that are relevant and necessary for the jury to weigh all of the evidence. *State v. Comen*, 50 Ohio St.3d 206,

553 N.E.2d 640 (1990). A defendant is only entitled to have proposed jury instructions given when they are correct statements of the law, pertinent to the evidence in the record or to material issues, and are timely presented and not already included in the substance of the jury charge. *State v. Guster*, 66 Ohio St.2d 266, 269, 421 N.E.2d 157 (1981).

**{¶ 77}** As previously stated, " '[t]o establish self-defense for the use of less than deadly force in defense of one's person, the defendant must prove: (1) he was not at fault in creating the situation which gave rise to the event in which the use of non-deadly force occurred; (2) he had honest and reasonable grounds to believe that such conduct was necessary to defend himself against the imminent use of unlawful force; and (3) the force used was not likely to cause death or great bodily harm.' " *Belcher,* 2d Dist. Montgomery No. 24968, 2013-Ohio-1234, at ¶ 34.

**{¶ 78}** Furthermore, "[d]efense of another is a variation of self-defense. Under certain circumstances, one may employ appropriate force to defend another individual against an assault. However, 'one who intervenes to help a stranger stands in the shoes of the person whom he is aiding, and if the person aided is the one at fault, then the intervenor is not justified in his use of force and is guilty of an assault.' * * * Therefore, one who claims the lawful right to act in defense of another must meet the criteria for the affirmative defense of self-defense." *Wenger,* 58 Ohio St.2d 336, 340, 390 N.E.2d 801.

**{¶ 79}** As stated in our analysis in the previous assignment of error, Murad was the initial aggressor in the assault on Aydin. Murad also used a deadly weapon when he initially ran up to Aydin and struck him in the head with a metal baton. During the second part of the assault, Murad again initiated the attack on Aydin when he grabbed the metal baton out of Izmir's car and ran across the street, yelling at Aydin that he was going to

"tear him to pieces." The record establishes that Murad was clearly at fault by initiating the attack that ultimately resulted in Aydin acting in self-defense by stabbing Murad.

{¶ 80} Izmir claims that he was entitled to a jury instruction on non-deadly force defense of another because he was merely protecting/defending Murad who had just been stabbed by Aydin. The evidence adduced at trial, however, establishes that Izmir and his co-defendants were the initial aggressors who started the fight with Aydin and attacked him using deadly force. Although Izmir did not possess a weapon during the assault, he acted in concert with his co-defendants, who were armed with metal poles, rebar, and collapsible metal batons. Therefore, we conclude that the trial court did not err, plainly or otherwise, when it did not sua sponte instruct the jury on non-deadly force defense of another.

### Assault Instruction

{¶ 81} We also note that Izmir did not request a jury instruction on the lesser included offense of misdemeanor assault or object to the jury instructions that were given by the trial court. Therefore, our review of his argument that an assault instruction should have been given is limited to a plain error analysis.

{¶ 82} An instruction on a lesser-included offense should only be given where the evidence warrants it, and where "the evidence does not support a conviction on a lesser included offense, it would be erroneous to instruct the jury thereon, as to do so would confront the jury with the choice of reaching an unreasonable conclusion." *State v. Dover*, 2d Dist. Clark No. 2013-CA-58, 2014-Ohio-2303, ¶ 3, citing *State v. Johnson*, 36 Ohio St.3d 224, 228, 522 N.E.2d 1082 (1988). In deciding whether to instruct the jury on a lesser-included offense, the trial court must view the evidence in a light most favorable to

the defendant. *State v. Callahan*, 2d Dist. Montgomery No. 24595, 2012-Ohio-1092, ¶ 33, citing *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2072, 865 N.E.2d 859, ¶ 192. "The lesser-included-offense instruction is not warranted every time 'some evidence' is presented to support the lesser offense. * * * Rather, a court must find 'sufficient evidence' to 'allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser included (or inferior degree) offense.' " *Id.*, quoting *State v. Shane*, 63 Ohio St.3d 630, 632-633, 590 N.E.2d 272 (1992).

{¶ 83} We recently addressed this issue as follows:

"The question of whether a particular offense should be submitted to the finder of fact as a lesser included offense involves a two-tiered analysis." (Citation omitted) *State v. Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, 989 N.E.2d 986, ¶ 6. "The first tier, also called the 'statutory-elements step,' is a purely legal question, wherein we determine whether one offense is generally a lesser included offense of the charged offense." *Id.*, citing *State v. Kidder*, 32 Ohio St.3d 279, 281, 513 N.E.2d 311 (1987). "The second tier looks to the evidence in a particular case and determines whether ' "a jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense." ' " *Id.*, quoting *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, ¶ 13. "[A] charge on the lesser offense is required 'only where the evidence presented at trial would reasonably support both an acquittal of the crime charged and a conviction upon the lesser included offense.' *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242,

¶ 192, quoting *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286 (1988),

paragraph two of the syllabus.

*State v. Pullen*, 2d Dist. Montgomery No. 25829, 2015-Ohio-552, ¶ 21.

{¶ 84} We have recognized that misdemeanor assault under R.C. 2903.13(B) can be a lesser-included offense of felonious assault. *State v. Fuller*, 2d Dist. Montgomery No. 20658, 2005-Ohio-3696, ¶ 14. We have also held that when the victim suffers serious physical harm, a misdemeanor assault under R.C. 2903.13(A) should not be considered as a lesser-included offense of felonious assault. *State v. Thornton*, 2d Dist. Montgomery No. 20652, 2005-Ohio-3744, ¶ 48.

{¶ 85} Izmir was indicted for felonious assault, under R.C. 2903.11(A)(1), which provides that no person shall "knowingly cause serious physical harm to another or to another's unborn." Pursuant to R.C. 2903.13, to prove a simple assault, the State must prove beyond a reasonable doubt that the defendant:

(A) knowingly caused or attempted to cause *physical harm* to another or to another's unborn, or

(B) recklessly caused serious physical harm to another or to another's unborn.

{¶ 86} The only difference between felonious assault under R.C. 2903.11(A)(1) and misdemeanor assault under R.C. 2903.13(A) is whether the harm caused was *serious physical harm*, as opposed to *non-serious physical harm*. The difference between felonious assault under R.C. 2903.11(A)(1), and misdemeanor assault under R.C. 2903.13(B) is the culpable mental state: for felonious assault the evidence must establish that the defendant acted knowingly, but for a simple assault the evidence need

only prove that the defendant acted recklessly; both offenses require proof that the act caused serious physical harm.

**{¶ 87}** We conclude that the evidence presented at trial did not reasonably support a conviction for assault under R.C. 2903.13(A) and an acquittal on the indicted charge of felonious assault. A conviction for assault under R.C. 2903.13(A) and an acquittal on the indicted charge of felonious assault would have required the jury to find that Izmir knowingly caused physical harm to Aydin but that his conduct did not knowingly cause serious physical harm to Aydin. "Serious physical harm" to a person is found when hospitalization is required or temporary incapacity is caused, as supported by the facts in the present case. R.C. 2901.01(A)(5). In the instant case, the parties stipulated that Aydin suffered serious physical harm after being attacked by Izmir and his co-defendants. Because of the stipulation, no jury could have reasonably found Izmir *not guilty* of causing serious physical harm, but guilty of causing physical harm.

**{¶ 88}** Significantly, even without the stipulation, the video recording admitted into evidence depicted Izmir swinging his arm toward Aydin's head and kicking him repeatedly in the head and body after he fell to the ground. Furthermore, while Izmir was attacking Aydin, the other co-defendants were striking him with metal poles and metal batons. Thus, we conclude that under these facts no reasonable trier of fact could have found that Izmir did not knowingly cause serious physical harm. *See State v. Underwood,* 2d Dist. Montgomery No. 26711, 2016-Ohio-1101, ¶ 17, 18.

**{¶ 89}** Even if Izmir had requested an instruction on misdemeanor assault under R.C. 2903.13(B), we conclude, upon consideration of the evidence, including the video, that no reasonable jury could have fond that Izmir's infliction of serious physical harm was

reckless, but not knowing. Therefore, on the facts in evidence in this case, we conclude that the trial court did not err by not giving an instruction on misdemeanor assault.

## Aggravated Assault

{¶ 90} "In *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), the Ohio Supreme Court held that aggravated assault is not a lesser-included offense of felonious assault. Rather, aggravated assault is an "inferior-degree offense," as it contains elements which are identical to the elements defining felonious assault, except for the additional mitigating element of serious provocation. *Id.* at 201-211. Thus, "in a trial for felonious assault, where the defendant presents sufficient evidence of serious provocation, an instruction on aggravated assault must be given to the jury.' * * * " *State v. Morrow*, 2d Dist. Clark No. 2002-CA-37, 2002-Ohio-6527, ¶ 7, fn. 2, citing *Deem*.

{¶ 91} In a felonious assault case, the trier of fact must consider an aggravated assault charge when sufficient evidence of serious provocation by the victim (or victims) exists. *State v. Mack*, 82 Ohio St.3d 198, 200, 694 N.E.2d 1328 (1998); *see also Deem* at paragraph four of the syllabus. "Provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonable sufficient to incite or arouse the defendant into using deadly force." *Deem* at paragraph five of the syllabus. In the context of aggravated assault, the evaluation of whether provocation is reasonably sufficient to constitute serious provocation is a two-part analysis. *Mack* at 201. First, an objective standard must be applied to determine whether the alleged provocation is reasonably sufficient to "arouse the passions of an ordinary person beyond the power of his or her control," and "to bring on a sudden passion or fit of rage." *Id.*, quoting *State v. Shane*, 63 Ohio St.3d 630, 634-635, 590 N.E.2d 272 (1992). If the objective standard

is satisfied, then a subjective standard must be applied to determine whether the defendant in a particular case was "actually under the influence of sudden passion or in a sudden fit of rage." *Mack* at 201, citing *Shane* at 634-635. *See also State v. Moore*, 2d Dist. Montgomery No. 20005, 2004-Ohio-3398, at ¶ 14.

**{¶ 92}** At trial, the focus of Izmir's defense was that he was only defending himself and his brother, Murad, when he attacked Aydin.   Of the four co-defendants, only Murad testified during trial.   Murad's only explanation for why he and the other co-defendants continued to attack Aydin was that they wanted to disarm him, keep him from picking up another weapon, and keep him from hurting anyone else.   Simply put, the evidence adduced at trial established, at best, that Izmir attacked Aydin in order to defend himself and/or defend his co-defendants.

**{¶ 93}** In *State v. Harding*, 2d Dist. Montgomery No. 24062, 2011-Ohio-2823, we stated the following:

> When analyzing the subjective prong of the test, "[e]vidence supporting the privilege of self-defense, i.e., that the defendant feared for his own personal safety, does not constitute sudden passion or fit of rage." *State v. Stewart*, Franklin App. No. 10AP-526, 2010-Ohio-466, at ¶ 13, citing *State v. Tantarelli* (May 23, 1995), 10th Dist. No. 94APA11-1618. See, also, *Mack* at 201; *State v. McClendon*, Montgomery App. No. 23558, 2010-Ohio-4757, at ¶ 23, [*vacated, in part, on other grounds by State v. McClendon*, 128 Ohio St.3d 354, 2011-Ohio-954, 994 N.E.2d 235] ("[T]here was insufficient subjective evidence that Defendant was actually acting under the influence of sudden passion or in a sudden fit of rage.

Rather, Defendant shot Driscoll out of fear because he was afraid Driscoll might be retrieving a weapon out of his coat. Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or a sudden fit of rage.") * * *

*Id.* at ¶ 43.

**{¶ 94}** Upon review, we conclude that the trial court was not required to instruct the jury on aggravated assault. *See State v. Hancock*, 2d Dist. Montgomery No. 19434, 2005-Ohio-127, ¶ 25. The defendant's actions in *Harding* were motivated by fear and self-defense. We stressed that under such circumstances, even if the defendant had satisfied the objective prong, he failed to fulfill the subjective prong of the test. *Id.* at ¶ 44 and 47. Furthermore, the evidence adduced by the State was inconsistent with an aggravated assault. There was no evidence that Izmir, subjectively, was actually under the influence of sudden passion or a fit of rage. Thus, the trial court did not err, plainly or otherwise, when it failed to give an instruction on the inferior-degree offense of aggravated assault.

**{¶ 95}** Izmir's sixth assignment of error is overruled.

**{¶ 96}** Izmir's seventh and final assignment of error is as follows:

THE FAILURE TO APPLY IN THE INSTANT CASE THE RULE SET FORTH BY THE UNITED STATES SUPREME COURT IN *GRIFFITH V. KY.*, 479 U.S. 314 (1987) AND ITS PROGENY THAT NEW RULES OF CRIMINAL PROCEDURE MUST BE APPLIED RETROACTIVELY FOR ALL CASES UNDER DIRECT REVIEW AS IT APPLIES TO OHIO'S SHIFTING OF THE BURDEN OF PROOF FROM THE DEFENDANT TO

THE STATE FOR THE AFFIRMATIVE DEFENSE OF SELF-DEFENSE WOULD VIOLATE THE DUE PROCESS CLAUSES OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE CONSTITUTION FOR THE STATE OF OHIO.

**{¶ 97}** In his final assignment, Izmir contends that he is entitled to retroactive application of the changes made by the legislature to Ohio's self-defense statute, R.C. 2901.05, as a result of Am.Sub.H.B. 228 ("H.B. 228"), which was effective on March 28, 2019. At the time of Izmir's trial in March 2018, the burden of proof with respect to a claim of self-defense lay with the defendant. H.B. 228 amended R.C. 2901.05(B)(1), switching the burden of proof to the State. The statute states in pertinent part:

(B)(1) A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, *the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense*, defense of another, or defense of that person's residence, as the case may be.

**{¶ 98}** It is undisputed that H.B. 228 did not become effective until more than year after Izmir's trial was completed. Nevertheless, Izmir argues that he is entitled to retroactive application of the benefit in the switch in burden of proof for claims of self-defense resulting from H.B. 228. In support of his argument, Izmir relies on three cases

discussing circumstances wherein new rules for the conduct of criminal prosecutions were applied retroactively to cases that were pending on direct review or not yet final.

{¶ 99} The first case cited by Izmir is *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). *Griffith* held that new rules for the conduct of criminal prosecutions must be "applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." *Id*. at 328. *Griffith* reasoned that "failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication," and further that "selective application of new rules violates the principle of treating similarly situated defendants the same." *Id*. at 322-323. In *Griffith*, the court applied *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)*,* retroactively in order to expand the rights of the defendant by prohibiting the use of peremptory challenges based on race.

{¶ 100} The second case relied upon by Izmir is *State v. Elmor*e, 122 Ohio St.3d 472, 2009-Ohio-3478, 912 N.E.2d 582, in which the Ohio Supreme Court held that the retroactive application of *State v. Foster*, 109 Ohio St.3d 1, 845 N.E.2d 470 (2006) to cases pending on direct appeal did not violate the ex post facto clauses of the United States or Ohio Constitutions.

{¶ 101} The instant case, however, does not involve the recognition of a new constitutional rule, as in *Griffith* and *Elmore*. Rather, H.B. 228 effected a statutory change regarding the manner in which the burden of proof in a self-defense claim is regulated at trial. Simply put, the instant case does not involve a constitutional issue. "Simply because the General Assembly has shifted the burden of proof going forward

with evidence of an affirmative defense of self-defense, defense of another, or defense of the accused's residence/vehicle, it does not equate to finding the former statute unconstitutional." *State v. Krug*, 11th Dist. Lake No. 2018-L-056, 2019-Ohio-926, ¶ 24. Therefore, Izmir's reliance on *Griffith* and *Elmore* is misplaced.

{¶ 102} The last case cited by Izmir is *Isaac v. Engle*, 646 F.2d 1129, 1135 (6th Cir.1980), wherein the Sixth Circuit held that the defendant was not precluded from seeking federal habeas corpus relief in order to challenge the fact that the jury was not properly instructed on who had the burden of proof in regard to proving or disproving a claim of self-defense, based upon the law that existed at the time of the defendant's original trial. *Id.* at 1131-1133. *Isaac* did not address the issue in the instant case, namely the application of statutory amendments retroactively. We also note that the court's decision in *Isaac* was reversed by the United States Supreme Court and is no longer good law. *Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).

{¶ 103} Other than relying on cases that are inapplicable to the instant case, Izmir provides no additional support for his argument that H.B. 228, which was not in effect until a year after his trial, should be applied retroactively. "A statute is presumed to be prospective in its operation unless expressly made retrospective." R.C. 1.48; *see Van Fossen v. Babcock Wilcox Co.*, 36 Ohio St.3d 100, 105, 522 N.E.2d 489 (1988). Here, the legislature has not indicated, expressly or otherwise, that H.B. 228 is to be retroactively applied. Furthermore, the reenactment, amendment, or repeal of a statute *does not*: 1) affect the prior operation of the statute or any prior action taken thereunder; 2) affect any validation, cure, right, privilege, obligation, or liability previously acquired, accrued, accorded, or incurred thereunder; 3) affect any violation thereof or penalty,

forfeiture, or punishment incurred in respect thereto, prior to the amendment or repeal; and 4) affect any investigation, proceeding, or remedy in respect of any such privilege, obligation, liability, penalty, forfeiture, or punishment. R.C. 1.58(A)(1-4). Accordingly, Izmir is not entitled to retroactive application of the burden-shifting changes made by the legislature to Ohio's self-defense statute, R.C. 2901.05, as a result of H.B. 228.

{¶ 104} Izmir's seventh and final assignment of error is overruled.

{¶ 105} All of Izmir's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Anthony R. Cicero
Hon. Mary Lynn Wiseman